196klopc                    Conference

*[STAMP: U.S. DISTRICT COURT FILED OCT 3 2011 D.S. S.D. OF N.Y.]*

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                         10 CR 798 (PAC)

5  AMAURY LOPEZ, JR., AMAURY
   LOPEZ, SR., FABIO MOREL,
6
                 Defendants.
7
   ------------------------------x
8
                                        New York, N.Y.
9                                       September 6, 2011
                                        4:25 p.m.
10

11 Before:

12                 HON. PAUL A. CROTTY,

13                                      District Judge

14                      APPEARANCES
15

16 PREET BHARARA,
        United States Attorney for the
17      Southern District of New York
   AIMEE HECTOR
18 DAVID MILLER
        Assistant United States Attorney
19
   IVAN STEPHAN FISHER
20      Attorney for Defendant Amaury Lopez, Jr.

21 STEVEN BRILL
        Attorney for Defendant Amaury Lopez, Sr.
22
   JOHN M. BURKE
23      Attorney for Defendant Fabio Morel

24
   ALSO PRESENT:
25 ALEX WIEDER, Spanish Interpreter
   PAULA GOLD, Spanish Interpreter

196klopc                          Conference

1          (In open court)

2          (Case called)

3          THE COURT:  Mr. Lopez, Sr., can you understand what

4     we're saying?

5          THE INTERPRETER:  No, he cannot not hear yet.  I'm

6     sorry, your Honor, the headset is not working.

7          (Pause)

8          THE COURT:  OK, now, Mr. Lopez.

9          DEFENDANT A LOPEZ SR.:  Yes.

10          THE COURT:  OK.  I have now before me the government's

11     motion in limine, a response from Mr. Burke and Mr. Brill who

12     joins Mr. Burke's motion, and then Mr. Brill's motion for

13     severance.

14          Mr. Fisher, did you submit any papers?

15          MR. FISHER:  No, your Honor.

16          THE COURT:  OK, fine.

17          All right, I'll hear from the government then on their

18     motion in limine.

19          MS. HECTOR:  Certainly, your Honor.  The government

20     first outlined three categories of information that the

21     government is seeking to admit in this trial, primarily as

22     evidence of the narcotics conspiracy itself.  I know we also

23     make the 404(b) argument, but most, if not all -- in fact, all

24     of this evidence is actual evidence of acts taken in

25     furtherance of the conspiracy.  The first is evidence regarding

196klopc                              Conference

1    the defendants' possession of guns.

2            The government sets out as examples some of those

3    acts.  We expect testimony that Amaury Lopez, Jr. possessed

4    numerous weapons during the course of this conspiracy,

5    including various firearms an UZI.  We expect evidence,

6    testimony, that he transported some of those weapons from

7    Puerto Rico to the United States by breaking them apart in

8    pieces and putting them through the mails.  We also expect

9    evidence that Amaury Lopez, Sr. kept a firearm in a safe

10   deposit box, and that evidence is going to be a tape recording

11   of Amaury Lopez, Sr. speaking with a coconspirator about

12   possessing that firearm in the safe deposit box with drugs as

13   well.

14           Starting with those, there is numerous precedent --

15   and the government has cited it to your Honor -- of courts in

16   this circuit admitting such evidence as evidence in furtherance

17   of a drug conspiracy because the Second Circuit and other

18   courts have said that guns are tools of the narcotics trade.

19   We expect witnesses to testify that those guns were kept for

20   that purpose for protection of the Lopez, Jr. organization and

21   as a means of continuing the organization's activities of

22   drug-dealing and protecting it against any others who would try

23   to thwart those activities.

24           The case law is clear that that comes in against all

25   the defendants in a conspiracy regardless of whether there's

196klopc                        Conference

1    specific testimony or evidence that every particular

2    participant actually had those weapons.  And there's also case

3    law that we cited that that evidence comes in whether or not

4    there are gun charges.  And specifically I'm referring to

5    Casamento, Fernandez and Wiener that were cited to your Honor,

6    cases which also upheld the admission of that kind of evidence

7    against a 403 challenge, which is one of the challenges that

8    Mr. Brill has levied on behalf of Mr. Amaury Lopez, Sr.

9           Moving next to the statements regarding prior

10   violence:  The government expects to elicit testimony from a

11   cooperating witness that Amaury Lopez, Jr., when he was in fact

12   initiating that cooperating witness into the conspiracy, told

13   him a story about the fact that he had participated in an

14   effort to kill a man named Tone, who was someone who he had

15   dealt drugs with and who he believed had stolen approximately

16   $500,000 from his organization.

17           THE COURT:  What's the date of that conversation?

18           MS. HECTOR:  That was around 2001, at the time --

19           THE COURT:  Before the conspiracy started?

20           MS. HECTOR:  Well, it's before the date of the

21   conspiracy in the indictment, but we --

22           THE COURT:  It's pretty remote, isn't it?

23           MS. HECTOR:  It's not, your Honor, it's actually not

24   very remote.  In fact, it's right before the conspiracy in the

25   indictment is started, is instituted.  And there's case law to

196klopc                        Conference

1   support that acts that happen right before a conspiracy as

2   charged in the indictment has started are still acts in

3   furtherance of that conspiracy.  And in this case, there was a

4   very specific purpose to telling that story, and that was to

5   inform this coconspirator of what would happen if one were to

6   steal from Mr. Lopez, Jr.'s organization.

7        And then there's a conversation in May -- May 19th,

8   2009 -- of Amaury Lopez, Sr. talking about the same homicide,

9   of a man who had stolen from Amaury Lopez, Jr. because he had

10  stolen from the organization.  So here we have Mr. Lopez, Sr.

11  telling that same story to another coconspirator, again, the

12  government would argue for the purpose of maintaining control

13  and authority over this organization and making sure that those

14  who worked with it and for it knew the consequences.

15       Your Honor, it's important to note that this is a

16  conspiracy that spans nearly a decade.  And part of the story

17  that the government intends to tell is, there's a reason that

18  this conspiracy lasted so long and was so successful for so

19  many years, and that is because Mr. Lopez, Jr. is the leader of

20  that conspiracy, ran it through intimidation and threats of

21  violence and the like.  And that's why those kinds of stories

22  were shared with the members of the conspiracy, to show what

23  would happen and to sustain the lifespan of this conspiracy by

24  making sure that the people who worked for it knew not to cross

25  Mr. Lopez, Jr.

196klopc                    Conference

1              It also explains the relationship among the parties.

2    It explains why the lower level people were willing to do what

3    they were willing to do for Lopez, Jr., and it explains how the

4    operation was run essentially, how Mr. Lopez, Jr. ran his

5    business, which was an ongoing basis.  This isn't going to be a

6    story of a buy/bust or one transaction; this is going to be

7    multiple, multiple transactions and seizures over nearly a

8    decade.

9              THE COURT:  OK, so we have possession of the guns, the

10   statements about prior violence.  What's your third?

11             MS. HECTOR:  And then there's the murder of Javier

12   Sanchez.  Again, we're seeking to admit this as direct proof of

13   the conspiracy because this murder was perpetrated in

14   furtherance of the very drug conspiracy that will be on trial

15   here.  This is a murder of an individual who was suspected of

16   stealing money, narcotics proceeds, from one of the

17   coconspirators, who will be a cooperating witness in this

18   trial.  He was then, Javier Sanchez was, also suspected of

19   plotting to steal monies from Lopez, Jr.  Once Mr. Lopez, Jr.

20   heard that, he approached the cooperating witness and basically

21   said, in sum and substance, this can't go on and we need to

22   take this person out.

23             He, Lopez, Jr., in conjunction with the cooperating

24   witness and Fabio Morel, concocted a plan orchestrated by

25   Lopez, Jr. to have this person killed.  Mr. Lopez, Jr. had

196klopc                        Conference

1    someone brought in from Puerto Rico to be the actual shooter of

2    the murder.  They took various steps in their plans.  A gun was

3    procured.  And then the shooter, who was an individual from

4    Puerto Rico, was dropped off in the vicinity of the victim, and

5    in a crowd of people shot that person in the face and neck area

6    and killed him, another person was grazed.

7            This is, in essence, how this conspiracy was operated,

8    how it was run.  This is how Mr. Lopez, Jr. did his business,

9    and this was why he was able to not only sustain the business

10   for that long, but also, in doing so, keep those people who

11   were his coconspirators involved and under his control, because

12   now he had individuals who he knew were involved in a murder at

13   his request and with his assistance.  That murder was done to

14   perpetuate this conspiracy.  It is part of the story of this

15   conspiracy.

16           THE COURT:  So in your view, 403 and 404 have

17   nothing -- well, I shouldn't say nothing, but it's evidence

18   of -- you're introducing this evidence as evidence of the

19   conspiracy itself and how it operated?

20           MS. HECTOR:  Yes.  Now, we also make the argument

21   under 404, but primarily this is evidence of the conspiracy.

22   403 certainly comes into play, your Honor, and I expect that

23   that's the most weighty issue upon your Honor in determining

24   whether this evidence comes in.  But I would submit that, first

25   of all, I believe the guns should absolutely come in and it's

196klopc                              Conference

1    entirely clear under the case law.  Once the guns come in, it

2    will not be entirely surprising to the jury --

3              THE COURT:  That guns are used?

4              MS. HECTOR:  -- that guns are being used, because the

5    purpose of guns in a narcotics conspiracy is to protect the

6    conspiracy, protect the drugs against those who would either

7    steal them, take them, steal narcotics proceeds, et cetera.

8              THE COURT:  The statements about the prior violence,

9    they don't have to be true statements, do they?

10             MS. HECTOR:  No, they don't, your Honor.  And we are

11   not seeking to prove those two up.  We are not seeking to put

12   on proof that Tone was actually murdered, we're not seeking to

13   put on that kind of proof.  We are seeking to use the

14   statements as statements as words out of one of the

15   defendants -- in fact, two of the defendants' mouths for the

16   purpose of indoctrinating those members of the conspiracy into

17   the sort of rules of the game of how the Lopez, Jr.

18   organization worked.

19             THE COURT:  The Sanchez murder took place when?

20             MS. HECTOR:  2004.  It's within the time period of

21   this conspiracy.

22             And, your Honor, I also note that the thing about the

23   Sanchez murder that will be very difficult is that if your

24   Honor wants to keep that out, we have the additional problem of

25   it being Giglio for one of the cooperating witnesses.  One of

196klopc                          Conference

1   the cooperating witnesses, the government would have to elicit

2   that, unless the defense wants to agree not to seek to cross on

3   it.  Otherwise the government would be obligated, and would

4   have every right, to elicit it during the this cooperating

5   witness' direct examination.  It would be extremely difficult

6   for that story to be told in any coherent way without

7   misleading the jury, for the defendants to be left out of that

8   story.  So that would put everyone in a very difficult position

9   of how to accomplish that end.

10              THE COURT:  Anything else you want to add?  I'll take

11  up 3500 material separately.

12              MS. HECTOR:  Separately?  OK, so that's all, unless

13  your Honor has additional questions.

14              THE COURT:  Mr. Burke?

15              MR. BURKE:  Judge, we stand with our papers that we

16  filed.  And I know the Court's heard these arguments many

17  times.  To the extent they're offering this material against

18  Mr. Morel, to show relationship to the parties, to show the

19  background of the conspiracy, under 403, they're highly

20  inflammatory and prejudicial and they don't belong before the

21  jury, they shouldn't be here.

22              THE COURT:  What about those cases in the Second

23  Circuit and all over -- really all over the United States that

24  say guns and drugs go together; if you have one, you have the

25  other?

196klopc                          Conference

1          MR. BURKE:  I understand.  That doesn't mean

2    everything comes in every time, Judge.

3          THE COURT:  I haven't seen any cases where it's been

4    excluded.  It seems to me the trend is that they come in.

5          MR. BURKE:  I know in this circuit they have a very

6    open understanding of 404 and 403, but I'm just saying in this

7    case, Judge, this material is certainly not needed to show the

8    relationship of the parties.  I don't think the government

9    really needs it to show a conspiracy.  It's really extremely

10   prejudicial and not that probative.

11         But I wanted to -- more importantly, Judge, if I could

12   turn myself to the most, I think, salient part of my argument,

13   and that's this:  I think under 403 and 404, it shouldn't come

14   in, you don't need it, it's prejudicial, it's inflammatory,

15   it's not really that effective.  They can do their case without

16   this material.  Then the government has a fallback position

17   regarding the murder of Mr. Sanchez.  They say, look, this is

18   direct proof of the conspiracy, it's part of the case, it is

19   the conspiracy, this is what they're doing together.

20         Let's assume arguendo it is.  And they mentioned --

21   this shows the rules of the gang, how they operate.  But we

22   have rules here too, we have rules here too, the Fifth

23   Amendment, the Sixth Amendment.  He's arrested, I think, in --

24   Mr. Morel was in April.

25         DEFENDANT MOREL:  April 29th, 2010.

196klopc                         Conference

1          MR. BURKE:  We heard about this murder last week, we

2     heard about this murder last week.  We're supposed to pick a

3     jury on Monday.

4          Now, they can say he's not directly charged of murder

5     in the indictment.  We just want to talk about it.  But if he's

6     able -- he's got to be able to defend himself in the case,

7     fight the case, make an investigation, look at the discovery.

8     The only discovery we have on this is the letter we received

9     from the government last week saying they were going to talk

10    about this murder.

11         THE COURT:  Well, somebody's going to talk about it

12    and you'll have the statements of the witness, correct?

13         MR. BURKE:  No, I do not -- I don't have these

14    statements of this witnesses talking about the Sanchez --

15         MS. HECTOR:  When the 3500 is turned over, which is

16    tonight or tomorrow morning, which is way in advance of when

17    the government typically turns over 3500 material.

18         MR. BURKE:  So they're giving me some partial evidence

19    on a murder three or four days before we pick a jury.  There

20    are autopsy reports, there are ballistics reports, there are

21    crime-scene photographs, there's a stack this thick -- I'm

22    making it up now -- there's a stack this thick of DD5s,

23    detective reports or whoever investigated this murder.  They

24    interviewed witnesses.  They went to the scene.  There could be

25    DNA reports.  There's no way we can defend against this or

196klopc                           Conference

1    investigate this or refute this without at least having that

2    information.

3              And for the government to say they're going to give us

4    part of this -- I understand, ahead of the 3500 deadline --

5    that's just not enough, Judge.  This is like a different --

6    excuse me, it's like a different country.  You know, they tell

7    you on Tuesday you're charged with a murder, you start the

8    trial on Friday and the verdict --

9              THE COURT:  But you're not charged with a murder.

10             MR. BURKE:  No, they're not.

11             THE COURT:  You're charged with a drug conspiracy.

12             MR. BURKE:  They're not charged with a murder, Judge,

13   but this is something we should have known about way, way ahead

14   of this so we could defend ourselves.  It's that simple.  I

15   came into this case late, I think July 28th, something like

16   that.

17             THE COURT:  Yes.

18             MR. BURKE:  I said, look, there's a trial date of

19   September 12th and I said, sure, I'll make every effort to do

20   that, you know, go through the material.  I think this just

21   makes it impossible because this is a seven-year-old murder

22   that they told me about three days ago.  How do you possibly

23   investigate that or find out what happened?

24             Now, they can say, look, we're just going to put a

25   little bit of this murder into evidence, a little truncated

196klopc                    Conference

1   part, we'll let the witness talk about how Mr. Morel was

2   involved or maybe somebody else was involved.  But that's not

3   fair, that's not due process.  We should have -- we have at the

4   minimum, Judge -- forgive me if I'm talking too loud -- at the

5   minimum, have discovery -- I mean autopsy reports, ballistics

6   reports, this is hospital records, this is witness statements.

7   We don't have anything, we have nothing.  We only have the

8   government's letter saying they intend to talk about this

9   during the direct case.

10          THE COURT:  What would you do with the autopsy

11  reports, Mr. Burke?  Certainly the victim is dead, right?

12          MR. BURKE:  Let's presume he's dead.

13          THE COURT:  Shot in the head.

14          MR. BURKE:  Let's say the witness says, look, I was

15  there, I shot him three times in the head.  The autopsy report

16  shows once.  Arguendo again, the witness says, look, I had a

17  .22 caliber revolver, I remember exactly what happened that

18  day.  The autopsy reports shows it's not a .22, it's a .45.

19  The witness statements, they could be entirely exculpatory of

20  Mr. Morel or anybody else sitting over here in the box.  They

21  could be in complete opposition to everything this witness

22  says.  If we speak the witnesses -- Judge, this is arguendo

23  now, right.  You have to give people discovery in a murder

24  case.

25          Now, you've done these 404/403 things many times.  And

196klopc                          Conference

1   usually what they do is, they toss in another drug sale before

2   the conspiracy to show that they're real drug dealers or they

3   show they've got money someplace to show they're money

4   launderers.  They threw a murder on the table last week.  I

5   know nothing about it.  It's impossible to defend against.

6   Even in their own arguments, they said, look -- they've put

7   some guns in here.  Guns aren't the same as a murder, guns

8   aren't the same as a murder.  All this discovery is out there.

9   We have not -- and even if it was put on my desk now, I would

10  need time to go through it, consult with people, possibly hire

11  an investigator, just to check it out.

12          THE COURT:  What do you say about Ms. Hector's point

13  that with respect to the cooperating witness, since he was

14  involved in the targeting of the murder, that he's going to

15  testify to that, they have to bring it out, otherwise they're

16  going to be caught -- you're going to catch them in a

17  coming-and-going, you'll have the witness on the stand, you'll

18  bring this out on cross-examination, and they won't be able to

19  ask about how the threat of violence was carried out, why the

20  threat of violence was carried out?  Ms. Hector suggested maybe

21  you wouldn't ask those questions.

22          MR. BURKE:  And, Judge, in all fairness, maybe I

23  wouldn't, but it's impossible --

24          THE COURT:  You have to do a little bit better than

25  that.

196klopc                          Conference

1            MR. BURKE:  Actually, forgive me, Judge, I didn't mean

2     to be cute, but why should I take a position of what my

3     cross-examination is going to be before I've been given any

4     basic information involving the crime or these witnesses or

5     anything?  I have nothing, so to look at me and say, well,

6     Mr. Burke, what would your position be on cross-examination

7     after they've had direct -- I don't know, I really don't know.

8     This is seven years ago and I have no information.  It would be

9     like dragging a lawyer off the street and sitting him down and

10    saying, look, what do you think about cross-examining Mr. X

11    where he's going to give these statements, and you say, I

12    really should check into this, I'd like to read some forensic

13    evidence, I'd like to see pictures of the crime scene.  I

14    really can't formulate even a halfway intelligent response to

15    the Court.  I don't know.

16            And people want to proceed?  The Court always has the

17    power to sever.  I am joining in co-counsel's motion regarding

18    violent acts that don't involve me certainly, with the Court's

19    permission, Judge.

20            THE COURT:  Well, Mr. Brill joined in yours and you're

21    joining in Mr. Brill's, I understand.

22            MR. BURKE:  Fine, and Mr. Fisher's too, whatever comes

23    up here.

24            But I just think it's a serious case, it has serious

25    ramifications for Mr. Morel, and this charge they just added

196klopc                          Conference

1    on, there's a lot to it.  It's not --

2         THE COURT:  You say it's not a charge, it's evidence,

3    right?

4         MR. BURKE:  It's not, it's not but it's evidence.

5    And, Judge, it is a charge to the jury.  Once they hear about a

6    murder, their ears are going to perk up.  It's very important.

7    And to say they just want to talk about a murder, I'm entitled

8    to -- Mr. Morel is entitled to, forget about me -- Mr. Morel is

9    entitled to see the evidence, to check it out.  That's just

10   fundamental fairness.  I didn't cite any cases because there's

11   not many cases on, look, we told you about the murder on

12   Tuesday, the trial starts on Monday, and you have no paper,

13   nothing.  So if you were -- I'm happy to sever Mr. Morel off

14   right now.  I know it's up to you.  I don't have the severance

15   power, but that's what it comes down to.

16        But I just think it's -- I'm repeating myself -- it's

17   a violation of his Fifth Amendment rights, his Sixth Amendment

18   right to have an adequate defense to prepare for trial.  If

19   they want to use this evidence and the Court wants to let it

20   in, we should be given time to view this discovery, do whatever

21   investigation we feel is necessary and check it out.  There was

22   an indication that Mr. Morel gave somebody a ride to an airport

23   or some -- we should be able to check out what happened.

24   That's all.  Thank you, Judge.

25        THE COURT:  Mr. Brill?

196klopc                         Conference

1          MR. BRILL:  Thank you, Judge.  I like what my

2     co-counsel said in large part, and I won't repeat it.  I will

3     just highlight a couple of points that I put in my papers.  I

4     assume the motion to sever should take priority.  I filed that

5     after I filed an opposition motion to the 404 argument and

6     direct evidence argument.

7          But I think what's most important with respect to

8     Mr. Lopez, Sr. is that he's not involved in any of the violent

9     acts that are alleged.  And I disagree only with Mr. Burke to

10    one extent, and that is, there are two murders essentially that

11    the government is going to allude to when they present their

12    evidence.  So the jury is not just going to hear one but two,

13    about two.  And I understand what the Court is saying in terms

14    of that drugs go with guns and drugs go with murders.  But

15    there are -- I'm not sure the Court -- I'm not sure there is a

16    more impactful or prejudicial piece of evidence than

17    essentially two murders that the government wants to bring out

18    here.  And I think that when the Court has to decide whether or

19    not -- the probative value of the murders that the government

20    wants to elicit, then the Court needs to, with all due respect,

21    strongly consider how prejudicial that's going to be to the

22    defendants.

23          But with respect to Mr. Lopez, Sr., there's no

24    evidence that he has any involvement or any connection to the

25    murders at all.  So the determination that the Court must make

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

196klopc                          Conference

1   as to whether or not it's prejudicial to someone like

2   Mr. Lopez, Sr., I think it becomes more significant because the

3   government then is available -- if he's not severed from this

4   particular case, the government is then able to essentially

5   bring out this evidence that in large part, maybe in all part,

6   have mostly to do with Mr. Lopez, Jr., but essentially argue

7   that the entire conspiracy is essentially responsible for it

8   and it was directly in furtherance of it, is, with someone like

9   Mr. Lopez, Sr., who takes no part in it, and the only

10  involvement that he has with these particular alleged murders,

11  I guess, and that they're not proven, they're not charged,

12  there's no discovery of them, is that eight or nine years after

13  the Tone murder occurs in 2001, the government is going to

14  present evidence that Mr. Lopez, Sr. discusses the murder with

15  someone else.  And that's his connection, and that's eight

16  years after this alleged event has occurred.

17          So if the Court allows it in and doesn't sever

18  Mr. Lopez, Sr. from this case, then essentially you're going to

19  have -- well respectfully I say this -- the jury will have to

20  be told that there's a very specific purpose for this, and they

21  can't attribute these acts to Mr. Lopez, Sr. and that they go

22  for a specific purpose.  But I think common sense dictates --

23          THE COURT:  So if I say that, then what happens then?

24  The Second Circuit says if you say those magic words, the jury

25  is presumed to be able to follow them and it eliminates the

196klopc                          Conference

1   prejudice about what you're complaining of.

2          MR. BRILL:  Yeah, I understand that that has certainly

3   been done and I know, in this Court's wisdom, that if the Court

4   denies our motions at this point, the Court will do that.   I

5   think, again, common sense kicks in, and that, your Honor, in

6   the most eloquent way, that you will say this to the jury.

7   Again, respectfully I say this.  I find it very --

8          THE COURT:  You say even if I say it, they're not

9   going to pay any attention?

10          MR. BRILL:  I think that there's a very strong

11   likelihood that if a jury hears about not one but two murders,

12   especially the type of murder that they're saying existed in

13   2004, with a shot to the face and shot to the neck at

14   pointblank range, however the Court is going to elicit it,

15   again, your Honor's words essentially are going to have to

16   unring a bell, and we all know how difficult that is.

17          So I don't think -- this is the type of case -- I

18   understand there have been cases where curative instructions

19   have been permitted and the Court has every power to offer one

20   here.  But given these circumstances, in light of the fact that

21   Mr. Lopez, Sr. is so remotely involved with the actual acts,

22   that if you combine those things, even a curative instruction

23   won't do the trick.

24          So in my humble opinion, I think a severance motion is

25   the only way in order to avoid that particular problem and

196klopc                    Conference

1    avoid that particular prejudice, which I think is overwhelming,

2    if the government is allowed to bring out what they'd like.

3              THE COURT:  Thank you, Mr. Burke.

4              Mr. Fisher?

5              MR. FISHER:  Yes, your Honor, if your Honor please, I

6    think the first observation I want to make has been mostly

7    made, I want to emphasize -- the notion that a curative

8    instruction is likely to succeed is, in my view, wrong.  As a

9    practical matter, it's difficult for me to imagine people on

10   the jury being persuaded that my client was involved in the

11   murder of Mr. Sanchez, that your Honor, however effectively you

12   put it, tells the jury that in the absence of evidence that my

13   client was involved in a narcotics conspiracy, they are not to

14   consider that or however your Honor winds up putting it.  It's

15   difficult, very, very difficult to conceive of jurors willing

16   to pass on someone sitting before them whom they believe

17   murdered somebody.  That's the big leap.

18             Now, it wasn't -- I've been aware, your Honor, for

19   some time that the witness in question the government is

20   putting on was involved in that murder.  In fact, your Honor,

21   I've been aware that he paid to have Mr. Sanchez killed with

22   his own money because Mr. Sanchez had stolen $300,000 from the

23   witness.  I met with the government recently in connection with

24   the negotiation sort of effort, and told the government that I

25   had this information.  What I didn't know was that this witness

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

196klopc                              Conference

1    is apparently now asserting that a year after the $300,000 was

2    stolen by the victim, Amaury Lopez a year later is thinking,

3    well, if, in fact, this Sanchez stole your $300,000, who knows,

4    maybe he'll steal money from me and so let's make a plan to

5    kill this guy.  Now, that's new.  That's very, very new.  I

6    didn't know about that until that recent letter arrived.

7             Dealing with this evidence, your Honor, is very tricky

8    stuff.  I feel obliged to tell you that it is my intention to

9    cross-examine this witness about this murder.  I intend to do

10   it, as I stand before you but not having read the 3500

11   material.  And I doubt very much, whatever it is, it will

12   dissuade me from my intention.

13            So why am I --

14            THE COURT:  Mr. Fisher, I don't want to put words in

15   your mouth, but I gather you're not surprised by this?

16            MR. FISHER:  I'm surprised --

17            THE COURT:  By some aspect of it, but you're not

18   surprised by the charge that Sanchez was killed --

19            MR. FISHER:  No.

20            THE COURT:  -- because of his involvement in a drug

21   deal?

22            MR. FISHER:  No, I'm not.  What I am surprised by is

23   the --

24            THE COURT:  Linking this with Morel -- excuse me, with

25   Lopez, Jr.

196klopc                          Conference

1          MR. FISHER:  Right, and that's a rather important --

2          THE COURT:  Yes, critical.

3          MR. FISHER:  So now this murder -- I'll stop calling

4    it an allegation -- this murder is hugely, hugely important in

5    this case.  And it's going to be in this case, it seems to me,

6    because that cooperator is an important witness for the

7    government and for us, and he's going to be on the stand.  And

8    the murder, I'm saying to you, in all likelihood -- it's in the

9    90 percent -- I'm going to cross-examine him about it.

10         Therefore, at the least, there should be the kinds of

11   discovery and disclosure my colleague Mr. Burke suggested

12   should have been made long before now, because that may very

13   well expose, from my perspective, the lack of involvement of my

14   client in this witness' decision to murder his former drug

15   partner for stealing $300,000 of their drug money.

16         So DD5s?  Yes.  Whatever statements were taken of

17   witnesses by the detectives in the local precinct, that sort of

18   material, it seems to me, should have been collected by the

19   government for discovery purposes, and if not discovery

20   purposes, then I hope it will be, at the very least, available

21   in the 3500 material.

22         Given the significance of this allegation, it almost

23   dwarfs everything else.  That should be done as expeditiously

24   as possible.  And after that's presented, I imagine there may

25   be further application to you or not, I don't know, but I know

1    this:  As much legitimate evidence shining light on the

2    involvement of whoever was responsible, everyone involved is

3    important.

4              THE COURT:  Thank you, Mr. Fisher.

5              Mr. Burke, you wanted to add something?

6              MR. BURKE:  Just very quickly, Judge.  We're aware

7    that the indictment, even the superseding indictment, doesn't

8    contain a murder charge in it.  But based upon the government's

9    submissions in their letter, I mean it explicitly says that the

10   evidence will show that Morel and others were involved in the

11   planning and execution of a murder in furtherance of a

12   conspiracy.

13             THE COURT:  You're referring to the motion in limine,

14   right?

15             MR. BURKE:  Yes, your Honor, I think, at page 3 and 17

16   is where they use those phrases.  So it's not just a little

17   side line; it's a major, major, major, major issue.  If there

18   was a dime bag of heroin in this case, we'd get a lab report

19   and they'd probably give it to us early on.  This is a murder

20   that was dropped on the table last week.  We respectfully

21   object to going forward on Monday.

22             THE COURT:  When did you first learn about the

23   cooperating witness' view on how the murder occurred and

24   Mr. Lopez's, Jr.'s rule role on it?

25             MS. HECTOR:  I don't have the exact date at my

1  fingertips, but is it was sometime before this summer we

2  learned about it.  However, it was something that we were

3  investigating, that we were looking into, that if we intended

4  to call this witness, we would fully put his statements to

5  investigators back at that time, and anything in the file that

6  would constitute Giglio or contradict anything that he said or

7  anything in the file that would be Brady as to these

8  defendants, we would of course turn over.  And we intend to

9  turn over those statements of this cooperating witness as part

10  of his 3500.

11          It's important --

12          THE COURT:  When will that be?

13          MS. HECTOR:  We plan to provide the bulk of 3500 late

14  tonight or early tomorrow morning, whenever the defendants'

15  counsel want to pick it up.  It will be late tonight, and you

16  guys can all come late tonight or early tomorrow morning.  The

17  bulk of it.  There are a couple witnesses --

18          THE COURT:  When you say the bulk of it, is it going

19  to include this material that we're talking about now?

20          MS. HECTOR:  Yes, yes.

21          THE COURT:  What about Mr. Burke's point about the

22  DD5s and the autopsies and the witness statements?

23          MS. HECTOR:  This is what -- because your Honor's

24  question with respect to, well, what would you do with an

25  autopsy report, I think, was the key question here, the

1    government does not claim that any of these defendants were the

2    shooter or were there, right there, on the scene at the time of

3    the murder.  We have pulled what we think would constitute Rule

4    16 material out of that file and it's about this big.

5            The crime scene reports, we will turn them over, but

6    the kind of weapon used will be clear in that, but none of the

7    ballistics are going to be these defendants', they're not the

8    ones who shot the gun, none of the eye witnesses are going to

9    have seen these defendants at the scene of the murder --

10           THE COURT:  Now you're telling me that the defendants

11   are not involved?

12           MS. HECTOR:  No, they're certainly involved; they're

13   not the shooter.

14           THE COURT:  OK.

15           MS. HECTOR:  So, for instance, Mr. Morel was on

16   another street --

17           THE COURT:  Let me pick up Mr. Fisher's argument and

18   Mr. Burke's argument.  This is highly, highly prejudicial; you

19   agree with that don't you?

20           MS. HECTOR:  Well, as is any probative evidence.

21           THE COURT:  But it's prejudicial, right?  And you have

22   other evidence of a drug conspiracy.  I've got to engage in a

23   balancing test with respect to 403.  You can prove the drug

24   conspiracy till the cows come home but you don't need a

25   shooting to do that, do you?

196klopc                          Conference

1          MS. HECTOR:  Well, your Honor, I don't think 403

2    analysis necessity comes into play in that analysis; it's more

3    prejudicial than probative.  In this case we think that this

4    particular evidence is extremely probative.  Whether or not the

5    government has other evidence probative of the defendants'

6    guilt is really not part of the analysis.

7          THE COURT:  Let's take it one at a time.  You have the

8    possession of guns, right?

9          MS. HECTOR:  Yes.

10          THE COURT:  And none of the arguments that defense

11    counsel made are legitimately persuasive on possession of guns.

12          MS. HECTOR:  True.

13          THE COURT:  OK.  So why isn't that enough in order for

14    you to make out your case?

15          MS. HECTOR:  Again, your Honor, I just don't think

16    that the standard is necessity for our case.  Do I think that

17    we can prove the case without it?  Absolutely.

18          THE COURT:  You have the statements about the prior

19    acts of violence to intimidate people and keep the drug

20    conspiracy in line, but one of those statements, at least one

21    of those statements, is prior to the conspiracy being formed,

22    as charged in the superseding indictment, correct?

23          MS. HECTOR:  True.

24          THE COURT:  I'm not particularly moved by your

25    argument in that respect.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

196klopc                          Conference

1              MS. HECTOR:  Well, your Honor, the case law is very

2    clear that acts prior to the charged period of the conspiracy

3    can be prove up at trial as acts in furtherance of the

4    conspiracy.  Mr. Burke admitted to that when he said the

5    typical kind of evidence in this case is a drug deal that

6    happened right before the conspiracy to show -- so I don't

7    think that the timing of either that event or that statement,

8    which is literally on the precipice of this conspiracy --

9              THE COURT:  Well, you have a conspiracy that you

10   allege started in 2002, somebody got shot in 2001.

11             MS. HECTOR:  The story was relayed in 2001, your

12   Honor.

13             THE COURT:  Was?

14             MS. HECTOR:  Relayed to the witness in 2001.

15             THE COURT:  And when did the --

16             MS. HECTOR:  The person had been shot before that.

17             THE COURT:  When was the shooting?

18             MS. HECTOR:  I'm not even sure exactly when the

19   shooting was.

20             THE COURT:  It was more distant in time.

21             MS. HECTOR:  So it was before that.  But what we're

22   trying to prove up is the statement itself.  That's the key

23   piece of evidence that we'd like --

24             THE COURT:  Tell me what's in the 3500 material with

25   respect to the Sanchez murder.

196klopc                     Conference

1    MS. HECTOR:  Well, it's all of the information that

2    the cooperating witness has told us about the murder is in

3    there.  So there are several proffer sessions that went over

4    those facts.  In addition, that cooperating witness was

5    interviewed back in 2004, at the time of the murder.  His

6    interview at the time is provided there.

7    THE COURT:  His interview by whom?

8    MS. HECTOR:  The New York Police Department is

9    provided there.

10    In addition, we provided a Giglio disclosure because

11   there were two eyewitnesses to that crime who originally told

12   investigators that the cooperating witness was the shooter.

13   They then recanted those statements.  We have also provided

14   that to the defendants in a Giglio disclosure already so that

15   they could already start their investigation of that if they

16   wanted to.

17    I also, though, think, your Honor, from what

18   Mr. Fisher has said, we may be arguing about nothing because he

19   has said that he intends to cross-examine our cooperating

20   witness about this murder.  That is going to open the door to

21   the circumstances and facts of this murder.  So we may be

22   arguing about nothing, because if that is the case -- I, first

23   of all, have the Giglio problem, which unless everyone is

24   willing to forego --

25    THE COURT:  I asked Mr. Burke that question and he was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

196klopc                          Conference

1    not willing to forego.

2          MS. HECTOR:  Yes.  So if that's the case, then I at

3    least have to elicit this in the Giglio, and it seems to that

4    at least Mr. Fisher intends to cross-examine extensively about

5    it.  So it looks like it's coming in, one way or another.  And

6    then once it comes in, the government should be allowed to put

7    on proof about it.  It's going to be part of the story of this

8    case.

9          THE COURT:  The order of proof would be substantially

10   different, though, wouldn't it?

11         MS. HECTOR:  I'm sorry?

12         THE COURT:  The order of proof would be substantially

13   different.  Mr. Fisher would have to -- he would have to bring

14   this up, then you could bring it in; not you bringing it in

15   because Mr. Fisher says he might bring it up, he might not.

16         MS. HECTOR:  Well, I don't think it's fair, though.

17   If he is going to bring it up, then we need to be allowed --

18         THE COURT:  We usually find out what defense counsel

19   is going to do after they've done it.

20         MS. HECTOR:  That may be true, but in this kind of

21   circumstance, if they intend to bring it up, then the

22   government has a right to bring it out on direct examination to

23   avoid the appearance to the jury that we are trying to hide

24   this defendant -- this cooperating witness' involvement in a

25   murder, which would be a significant attack upon his

196klopc                         Conference

1    credibility and upon the government's credibility if we're not

2    allowed to do that.  And then Mr. Fisher is allowed to get up

3    and cross-examine him on it.  So we're in a bit of a Catch-22

4    on that if we're not.

5           We also can address the severance motion, which

6    Mr. Miller is prepared to address if your Honor would like.

7           THE COURT:  Well, I'm more interested in the 3500

8    material.  Then we'll hear from Mr. Miller on severance.

9           MS. HECTOR:  OK.

10          MR. FISHER:  Your Honor, may I make a suggestion?

11          THE COURT:  Yes.

12          MR. FISHER:  I think it would be a very good idea if

13   your Honor would agree to have a further conference after we

14   had the 3500 material because I can be much -- well, I've been

15   pretty -- I've been as clear as I could be at this point, but I

16   know that a review of the 3500 material will put me, I think,

17   in a position to say to you and the government what I intend to

18   do.  And that seems to be, I think, a very -- I think that

19   matters a lot.

20          THE COURT:  All right.  What do you say about that?

21          MS. HECTOR:  The government does not object to that.

22   We could -- the only thing is that at some point -- because

23   obviously this witness will have to be prepared very carefully

24   as to what to or not say if he's going to be told he cannot

25   talk about it or he can talk about it, so that we don't have an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

196klopc                    Conference

1    inadvertent disclosure on the stand and because there are other

2    witnesses that the government has to call if this is coming in

3    or not, we'd obviously like a decision on it obviously sooner

4    rather than later.

5            MR. FISHER:  We'd like the 3500 material sooner than

6    later, your Honor.

7            THE COURT:  I would have preferred that if this issue

8    had been surfaced sooner rather than on the eve of trial --

9            MR. BURKE:  And, Judge, I just want to go back --

10           THE COURT:  -- as everybody's talking about their

11   preferences.

12           MR. BURKE:  You said to the government, when did you

13   find about this Sanchez murder.  Essentially the reply:

14   Beginning of the summer, before the summer, something like

15   that.  And the first thing they did was they investigated it.

16   We're in a position now where they get to investigate, we

17   don't; they get to cherrypick parts of a murder file and give

18   us some of it, because I didn't hear about ballistics and

19   autopsy reports and not just this testifying witness

20   statements, I mean all the statements about the murder.  If

21   there's a murder of someone who's shot down in New York City in

22   the street, there's a file that is three or four inches thick,

23   documents about -- there's a 911 call, there are hospital

24   records, there's all sorts of material that if they don't have,

25   they have access to.  And we go back to stage one here.  We're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

196klopc                          Conference

1      in a position where we really can't defend against this.

2              MS. HECTOR:  Your Honor, they're only entitled to what

3      is appropriate under Rule 16.

4              THE COURT:  Yeah, I understand.

5              MS. HECTOR:  Witness statements would not be included.

6              THE COURT:  What about the 3500 material?

7              MS. HECTOR:  As I said, your Honor, our paralegal is

8      making copies of it right now.  So we have been told by our

9      paralegal that --

10             THE COURT:  I'm referring to the 3500 -- I assume it

11     will be available tonight; if not tonight, then first thing

12     tomorrow morning?

13             MS. HECTOR:  Yes, your Honor.

14             THE COURT:  Tonight is now ten after 5:00.

15             MS. HECTOR:  Yes.

16             THE COURT:  So I don't know how prompt your paralegal

17     is.

18             I was referring to your 3500 material that you say has

19     got to be disclosed but disclosed under somewhat restricted

20     standards because of the danger.

21             MS. HECTOR:  What about the argument about that?

22             THE COURT:  Yes.

23             MS. HECTOR:  Well, your Honor -- and there's precedent

24     for this in this courthouse -- we have concerns about safety

25     issues concerning witnesses, particularly in this case where we

196klopc                    Conference

1    know that discovery material has been passed around, and we

2    believe passed around for the purpose of identifying witnesses

3    and potentially threatening those witnesses.

4          Your Honor is very well aware that when Amaury

5    Lopez, Jr. was arrested, even though it was months after the

6    Fabio/Morel arrest, he had the CD from the Fabio/Morel arrest

7    surveillance in his car and was on the street of one of the

8    potential government witnesses, we believe for the purpose of

9    going to confront him with that.  We have also been told by

10   witnesses of other incidents where Mr. Lopez, Jr. has gotten

11   his hands on discovery pieces, particularly the statements that

12   William Pozo made implicating Mr. Morel and that Mr. Lopez, Jr.

13   told witnesses Mr. Pozo should have his legs cut off for this,

14   because he had it, he had access to it, and he was aware of it.

15         We also have been told of him having court papers with

16   respect to the seizure of $136,000 that Pedro Moises Del Valle

17   was caught with in 2002 and that, again, Mr. Lopez, Jr. had

18   those papers and was looking at those papers to see what

19   Mr. Del Valle had said about him.  We are extremely

20   concerned -- we have been told of people approaching our

21   witnesses, we have been told about calls to our witnesses -- we

22   are extremely concerned in these situations to make sure that

23   the 3500 material is not passed around for the purpose of

24   intimidating witnesses or pressuring witnesses or identifying

25   witnesses for other people.  And so it's not uncommon in cases

196klopc                              Conference

1    involving violence like this to ask for protective orders --

2    I've done it in other cases -- and to have them granted for

3    that reason.

4                As your Honor is aware, we're not required to give

5    3500 material until after that witness has testified.  Of

6    course we don't do that; we typically in this district do it

7    the Friday before trial.  We're agreeing to do it tonight for

8    the bulk of the material, to give even extra time.  It is two

9    binders.  It's not incredibly voluminous.  And either defense

10   counsel, paralegals, anyone who works with them, can go to the

11   prison and review it with their clients.  And they can also do

12   it during the trial because, as you know, this is a two-week

13   trial, so there will be time during the trial, on the evenings

14   or during breaks, to review it as well.  So we think it's a

15   reasonable request in this instance.

16               THE COURT:  Mr. Fisher?

17               MR. FISHER:  If your Honor please, it is utterly

18   unreasonable and nonsensical.  Given the concerns the

19   government has urged upon the Court, I wonder that rhetorically

20   whether or not my client and I apparently would be permitted to

21   review this material, in fact, required to review it together;

22   otherwise, he can't review it unless I have someone else there.

23   Is he permitted to make notes?  I would assume yes.

24               Your Honor, when I personally prepare, once I get the

25   3500 material, it is invariably the case that I read it many,

196klopc                    Conference

1   many times, because reading it the first time gives me one

2   level of comprehension, but then as I go on, issues arise on

3   account of disclosures of other witnesses connected to the

4   first witness' material whom I read.  Now I go back and read it

5   again.  It is always the case that I read it five, six, seven

6   times.  So we're not talking about two binders, we're talking

7   about ten.  And it's such an important part of the preparation.

8           Now, I was going to ask you for an order permitting my

9   client to have a daily copy because he's broke.  He hasn't been

10  able --

11          THE COURT:  I'll be happy to sign that.

12          MR. FISHER:  Thank you.

13          We don't have the resources to have someone at the MCC

14  with my client doing nothing but sitting there watching him

15  read this as often as he needs to and I need him to.

16          The information, your Honor?  I share the concern of

17  the government, as much as anyone, about the intimidation of

18  witnesses.  It's awful.  And you know what else, it's awful

19  evidence.  However, I desperately need my client's very, very

20  informed observations with recollection refreshed by this

21  material, that he's had an opportunity to read again and again

22  and again.  I know, on account of the discovery process and my

23  meetings with him, he reads that stuff over and over and over.

24  He left me a message today that I should come and see him

25  early.  I wasn't able to do that because he had just come up

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    with some very important things he discovered in the papers we

2    just recently got from the government.  He can't sleep, he's up

3    all night, he's going over this stuff.

4          Now, how does it give us any comfort with regard to

5    the safety of witnesses?  Once he's read this material, I

6    assume he'd be permitted to make notes, and he has all of that

7    information that can be good, can be used for the good of -- as

8    well-defended a case as possible or for the harm that the

9    government fears will occur.  It won't matter.  What will

10   definitely happen is that we will be significantly impeded in

11   our efforts to present as sound a defense as we can.

12         The government talks about how gracious it is in

13   giving us this material sooner than their usual policy and all

14   of this stuff.  However, I had no notice whatsoever that this

15   sort of application was coming, none.

16         So if, in fact, their intention was to make this

17   application, they should have made it many weeks ago, to at

18   least, in the event I've been unable to persuade the Court to

19   deny it, at least to comply with it.  There's no time --

20         THE COURT:  How would you comply with it?  It's all

21   contingent on the 3500 material.

22         MR. FISHER:  Right.

23         THE COURT:  The 3500 material is not going to be

24   produced until a time prior -- shortly prior to the

25   commencement of the trial.  And then that's the time you say,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

196klopc                          Conference

1   I'm going to give over the material but I want it delivered

2   subject to certain conditions, the conditions are those that

3   are imminently necessary because of legitimate fears that the

4   information may be misused, and there's a record in this case

5   of some misuse of -- allegations of some misuse of information.

6           So there is a predicate for it.

7           MR. FISHER:  If your Honor please --

8           THE COURT:  Yes.

9           MR. FISHER:  -- if, in fact -- the point I am wanting

10  to share with you is that if in fact they wanted this

11  extraordinary -- I have never, in 42 years in this building and

12  its predecessor, I have never encountered this order, ever.

13          Now, if in fact they wanted to do this in a

14  responsible way, and actually obtain what they seek, I'm

15  suggesting they should have provided the 3500 material a lot

16  sooner, because going through it the way they require -- would

17  have you require us to do it, multiplies the time required to

18  go through it two or three times.  It should have been done a

19  lot sooner.

20          THE COURT:  I don't want to cut you off, Mr. Fisher,

21  but I understand your point.  I know Mr. Burke is dying to say

22  something.

23          MR. BURKE:  Just echoing Mr. Fisher, Judge:  I

24  mentioned it in my papers, but essentially now we're in a

25  position where we don't have disclosure in discovery; and then

196klopc                    Conference

1    when we get it, they can't see it, "they" being the defense.

2            THE COURT:  That isn't --

3            MR. BURKE:  I've been got to be at the jail or

4    someone's got to be there at the jail holding their hand while

5    they're reading it.  It's really a Sixth Amendment issue.  It's

6    not practical, it's not fair.  We should have had this material

7    weeks ago --

8            THE COURT:  But you don't get 3500 material weeks

9    before.

10           MR. BURKE:  If we have to arrange a schedule for

11   people to read it, you have to do something, Judge, because we

12   have to work on the case -- meaning the lawyers -- so you

13   cannot be there with them all the time.  I think they're

14   magnifying the hurdles for this case going forward.

15           THE COURT:  Now, what do you say about destroying or

16   returning all 3500 materials at the conclusion of when the

17   appeal becomes final?

18           MR. FISHER:  I have no objection.

19           MR. BURKE:  When we're done, it's OK, Judge.

20           THE COURT:  How about defense is precluded from

21   disseminating any 3500 materials to anyone beyond the

22   defendants, defense counsel, paralegal or staff employed by the

23   defense?

24           MR. FISHER:  No objection.

25           MR. BURKE:  Fine.

196klopc                              Conference

1          MR. BRILL:  No objection.

2          THE COURT:  And the defendants themselves are

3   precluded from taking any 3500 materials -- well, how about

4   just copying 3500 materials?

5          MR. FISHER:  No objection, your Honor.

6          MR. BURKE:  Sorry, what was the last one?

7          THE COURT:  Defendants would be precluded from copying

8   3500 materials.

9          MR. FISHER:  But I assume we'd be permitted to give

10  them a copy that they could use to read?

11         THE COURT:  Yes.

12         MR. FISHER:  But not to further copy it.  No

13  objection.

14         MR. BURKE:  Fine, as long as they get the copy.

15         MR. BRILL:  No objection, your Honor.

16         THE COURT:  OK.

17         Ms. Hector, you want to be heard on that?

18         MS. HECTOR:  Your Honor, we object for the reasons we

19  stated.  I think --

20         THE COURT:  You've got two out of three, a limitation

21  on three?

22         MS. HECTOR:  Yes, but our concern is if they have it,

23  they can pass it around the jail, et cetera, and it can

24  cause --

25         THE COURT:  Aren't they going to be busy reading the

196klopc                           Conference

1    material?

2              MS. HECTOR:  I would hope so, but given the issues in

3    this case, I don't know that the government has confidence

4    that's going to happen, which is why we made the request we

5    did.

6              THE COURT:  All right.

7              Mr. Miller, you want to talk about severance?

8              MR. MILLER:  Sure, your Honor.  Your Honor, we

9    filed -- we got the motion on Saturday, we filed the opposition

10   on Sunday.

11             THE COURT:  Yes, I read it.

12             MR. MILLER:  OK, great.

13             The most important issue, your Honor, which we outline

14   in our brief, is the fact that this is, as your Honor is aware,

15   evidence in furtherance of the conspiracy.

16             THE COURT:  Yes.

17             MR. MILLER:  Amaury Lopez, Sr. is alleged to be a

18   conspirator; therefore, he's all in.  So it doesn't really

19   matter whether or not it's a violent act by another defendant.

20   We point that out and cite to Second Circuit law in our brief.

21   The point is there's no such thing here as prejudicial

22   spillover because even if the case was severed, we could use

23   that evidence against Amaury Lopez, Sr. in his own trial.  So

24   there's no such thing as prejudicial spillover.  This document

25   does not apply here.  We cite to cases that say that.

196klopc                        Conference

1          Additionally, your Honor, even if there were, as I

2   point out, some violent acts by other defendants and not this

3   defendant, and your Honor was inclined to recognize that there

4   is some sort of prejudice associated with this, the Second

5   Circuit has said violent acts by some defendants in the context

6   of a conspiracy, not only is he on the hook for but indeed

7   jurors can segregate that when they consider it.

8          We don't think, however, a curative instruction is

9   even necessary because as we set forth in our brief, this is

10  all evidence against Amaury Lopez, Sr. even in his own trial.

11  And even if that wasn't the case, even if for some reason there

12  was a spillover argument and somehow this evidence couldn't be

13  directed at him, that's where we come into the curative

14  instruction.  And we point that out at the very end of our

15  brief as sort of a fallback position, but we note that the law

16  is clear and axiomatic that you don't get there because of the

17  fact that Amaury Lopez, Sr. is all in in this conspiracy and

18  therefore he's criminally responsible for all the acts of his

19  coconspirators in furtherance of that conspiracy, and the

20  government submits that this murder was such an act.

21          THE COURT:  Thank you.

22          Yes, Mr. Brill?

23          MR. BRILL:  I think what speaks volumes, in all due

24  respect to the government, is they're being somewhat

25  presumptuous to the Court, they've now speculated that if

196klopc                          Conference

1    indeed your Honor does sever, that we're now fast-forwarded

2    into Mr. Lopez's, Sr.'s trial, and you have permitted at that

3    point that evidence to come in against him.  That strikes me as

4    somewhat presumptuous as to whether or not your Honor would

5    allow at that point, when Mr. Lopez, Jr. is no longer in the

6    case and that, at least with respect to Mr. Sanchez, the murder

7    of Mr. Sanchez in 2004 --

8             THE COURT:  No, the point that Mr. Miller is making,

9    as I understand it, is it's evidence of the conspiracy and even

10   if your client is severed, it would still be evidence of the

11   conspiracy and his role in the conspiracy, so it would be

12   admissible.  So if it's admissible in the second trial, by its

13   very force of nature, it's got to be admissible in the first

14   trial as well.

15             Is that the argument?

16             MR. MILLER:  Yes, your Honor, plus the fact that the

17   doctrine of spillover prejudice, as we outline and cite to

18   Second Circuit decisions, doesn't apply here for that very

19   reason, your Honor.

20             MR. BRILL:  And my point, your Honor, is that your

21   Honor would still -- what we're doing now with respect to

22   whether or not this evidence, with respect to the Sanchez

23   murder, comes in as furtherance of the conspiracy -- and your

24   Honor has to make that determination as to whether or not it

25   does and therefore you'll let that particular evidence in --

196klopc                        Conference

1    that same determination would need to be made with respect to

2    Mr. Lopez, Sr., and my argument is that with Mr. Lopez, Jr. out

3    of the case and Mr. Lopez, Sr. tried alone, I believe that the

4    determination that the Court would make as to whether or not

5    it's actually in furtherance of the conspiracy, even though

6    Mr. Lopez, Sr. is a member of the conspiracy, if we're at that

7    point, I would respectfully ask the Court to evaluate

8    Mr. Lopez, Sr. and what his role was with respect to the

9    conspiracy before the Court makes the determination as to

10   whether or not a murder that was committed eight years ago by a

11   coconspirator that no longer exists in the case is relevant to

12   Mr. Lopez, Sr.'s involvement in the conspiracy.  I don't think

13   it's as easy as long as, it's part of the conspiracy, no matter

14   who's on trial, it comes in.

15             So that's my point.

16             THE COURT:  Thank you very much.

17             All right, I'm going to rule on with respect to the

18   3500 material, I'm going to modify the order that has been

19   presented to me along the lines that I suggested.  So I'm going

20   to order that the defense counsel must destroy or return copies

21   when the appeal becomes final.  And the defense is going to be

22   precluded from disseminating any of these materials to anyone

23   beyond the defendants and the paralegals and defense counsel

24   and so forth.  And the defendants themselves are going to be

25   precluded from making any copies of the 3500 material.  I think

196klopc                          Conference

1    that that is an appropriate disposition.

2          With respect to the possession -- the evidence about

3    possession of guns, that phase of the motion in limine is

4    granted.  The guns -- evidence of possession of guns by

5    Mr. Lopez, Jr. and Mr. Lopez, Sr., Mr. Morel, if there is any

6    evidence, that's appropriate.

7          With respect to statements of prior violence, the 2001

8    statement dealing with violence that occurred in the previous

9    really two decades ago, in the '90s, that will be excluded.

10         The 2009 statement, that may be used.

11         With respect to the murder of Sanchez, the event that

12    occurred in 2004, I'm going to adopt Mr. Fisher's suggestion:

13    I want to see the 3500 material.  I'd ask that that be

14    delivered to chambers this evening.  We'll have a conference on

15    Friday.

16         Marlon, what time on Friday?

17         THE DEPUTY CLERK:  11:00 a.m., your Honor.

18         THE COURT:  11:00 a.m. on Friday.

19         MR. BRILL:  Your Honor, I have a plea at 12:00 but

20    I'll do my best.

21         THE COURT:  You've got to do your best, Mr. Brill.

22         MR. BRILL:  Sure.

23         THE COURT:  You want to do it 10:30?

24         MR. BRILL:  That would be better for me.  I don't know

25    how --

196klopc                         Conference

1            MR. FISHER:  No problem.

2            THE COURT:  We have a plea at 10:30.  We'll try to

3    reschedule the plea at 10:00 o'clock.  We'll start here at

4    10:30.

5            MR. FISHER:  Thank you, your Honor.

6            MS. HECTOR:  Your Honor, may I just ask with respect

7    to the protective order:  The government would request that in

8    addition to the defendants not copying it, that the defendants

9    also not be allowed to disseminate it, to the extent that

10   they're able to disseminate it in some other fashion.

11           MR. FISHER:  Except between counsel and counsel's

12   associates --

13           MS. HECTOR:  Of course.

14           MR. FISHER:  -- in the case.

15           No objection.

16           MR. BRILL:  Agreed.

17           THE COURT:  All right.

18           MR. BRILL:  May I ask for clarification on the ruling.

19   It sounds like your Honor precluded the government from

20   bringing out any evidence regarding the murder of Tone, as they

21   put it in their motion.

22           THE COURT:  No, no.

23           MR. BRILL:  -- except to the extent of my client?

24           THE COURT:  Yeah, right, in 2009.

25           MR. BRILL:  OK.  And my question to the government is:

196klopc                         Conference

1    Does there exist a recorded -- in this conversation that

2    they're referring to, is that recorded?

3            MS. HECTOR:  Yes, your Honor.

4            THE COURT:  I thought Mr. Miller said, yes, it was

5    recorded.

6            MS. HECTOR:  It is.  And you have the transcript for

7    it from 5/19.

8            MR. BRILL:  OK.

9            All right, Judge, I understand now.

10           THE COURT:  Mr. Burke?

11           MR. BURKE:  Forgive me, Judge, I'm sidetracking.  Just

12   a question I had:  The government indicated in their 404(b)

13   letter that there was a conversation Mr. Morel had with someone

14   about hiding the vest or destroying the proceeds of the

15   conspiracy.  Is that on tape?

16           MS. HECTOR:  No, that will be through a witness.

17           MR. BURKE:  And forgive me, just for the clarity of

18   the record, I don't have that statement anywhere, do I?

19           MS. HECTOR:  No, but it's part of the 3500.

20           MR. BURKE:  Great.  Thank you.

21           THE COURT:  Discovery session over now?

22           MR. BURKE:  I'm sorry, Judge, forgive me, I didn't

23   mean to highjack the proceedings.

24           THE COURT:  All right.

25           Anything else?  See you on Friday at 10:30.

196klopc                    Conference

1          MS. HECTOR:  Your Honor, actually --

2          THE COURT:  Oh, yeah, on the superseding indictment, I

3     guess we have to arraign the defendants.

4          MS. HECTOR:  Yes.

5          MR. FISHER:  May I just confer with my client?

6          MR. BRILL:  Yes, I'd like to do the same thing.

7          THE COURT:  Oh, fine.

8          MR. FISHER:  Thank you.

9          (Pause)

10         THE COURT:  Are you ready to proceed?

11         MR. FISHER:  Yes, your Honor.

12         THE COURT:  Have the defendants seen a copy of S2, the

13    superseding indictment?

14         MR. FISHER:  Mr. Lopez, Jr. has, your Honor.

15         MR. BRILL:  As well as Mr. Lopez, Sr.

16         MR. BURKE:  As well as Fabio Morel, Judge.

17         THE COURT:  And you have consulted with your attorneys

18    about the superseding indictment.

19         MR. FISHER:  Yes.

20         MR. BRILL:  Yes.

21         MR. BURKE:  Yes.

22         THE COURT:  Do you want me to read the superseding

23    indictment to you or do you waive the reading of it?

24         MR. FISHER:  We waive, your Honor.

25         THE COURT:  OK.  Enter a plea?

196klopc                          Conference

1              MR. FISHER:  Not guilty.

2              MR. BRILL:  Likewise, with respect to Mr. Lopez, Sr.

3              MR. BURKE:  Not guilty, Judge.

4              THE COURT:  All right, we'll see you Friday morning at

5     10:30.

6              MS. HECTOR:  Your Honor, just a couple housekeeping

7     matters, if I may?

8              THE COURT:  Yes.

9              MS. HECTOR:  First, does your Honor sit on Fridays for

10    trial?

11             THE COURT:  Yes.  I start sitting at 9:30 on Monday,

12    and I don't rise until Friday at 4:00 --

13             MS. HECTOR:  OK.

14             THE COURT:  -- with breaks at the beginning and end of

15    the day.

16             MS. HECTOR:  Certainly.

17             I just want to note for the record that we noticed a

18    mistake in the request to charge, so we will be refiling.  No

19    one has commented on the request to charge and I assume we will

20    have a charging conference --

21             THE COURT:  We will have a charging conference.

22             MS. HECTOR:  -- but there is a mistake with respect to

23    the jury needs to find drug weight with respect to the

24    substantive charges, and that's not in there.  So we will

25    revise that.

196klopc                    Conference

1          THE COURT:  All right.

2          MS. HECTOR:  The other -- on a personal note, I have a

3   doctor's appointment on September 22nd at 10:45, and it's with

4   a specialist that I had been spending some time trying to get

5   this appointment.  I tried to make it first thing in the

6   morning or to make it after this trial, but I have not been

7   able to.  She's going to call me if there is an opening, but I

8   just wanted to alert your Honor to that issue and ask if I may

9   attend that appointment if it happens.

10         THE COURT:  Well, what's the alternative?

11         MS. HECTOR:  Potentially some additional weeks before

12  I get to see her again.  And it's related to my pregnancy; it's

13  pretty important that I go to it.

14         THE COURT:  You're trying to make the appointment

15  earlier?

16         MS. HECTOR:  I'm trying, and I'm also asking whether

17  there's -- if there's a cancelation the next week early in the

18  next we week so I could do it, but absent that, I have this

19  issue.

20         THE COURT:  OK.  We'll do our best.

21         MS. HECTOR:  OK, thank you.

22         THE COURT:  I start at 9:30 in the morning and I go to

23  12:45; I break from 12:45 to 2:00; go from 2:00 to 4:30.

24  There's a 15-minute break in the morning and a 15-minute break

25  in the afternoon.

196klopc                        Conference

1          MR. FISHER:  And we begin on the 12th at 9:30, your

2     Honor?

3          THE COURT:  Yeah.  Well, I don't know what time we

4     begin on the 12th.  That all depends on when the jury pool

5     arrives.

6          MR. FISHER:  OK.

7          THE COURT:  I don't know how many jurors they've

8     assembled downstairs, I don't know how much the

9     prequalifications will take, I don't know how many other juries

10    are going to be consulted that day.  So it's sometime --

11    criminal cases, as you know, have priority, so 9:30, 10:00,

12    10:30, as soon as the array arrives, we'll get started.  It's a

13    two-week trial.

14         MR. FISHER:  OK.

15         THE COURT:  See you --

16         MR. FISHER:  That's my understanding.

17         THE COURT:  OK, I'll see you Friday at 10:30.

18         MR. FISHER:  Thank you, your Honor.

19         MS. HECTOR:  Thank you.

20         (Pause)

21         THE COURT:  Mr. Brill is correct, I didn't rule on

22    his motion.  The motion for severance is denied.

23         Thank you, Mr. Brill.

24                             * * *

25