UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :

      - v. -                              :

AMAURY LOPEZ JR.,                       :   S2 10 Cr. 798 (PAC)
    a/k/a "Junior,"
AMAURY LOPEZ SR.,                       :
FABIO MOREL,
    a/k/a "Fabian Luna,"               :
    a/k/a "Efrain Delvalle,"
                     :

          Defendants.                      :
- - - - - - - - - - - - - - - - - x


**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTION FOR A NEW TRIAL BY AMAURY LOPEZ, SR.**


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Aimee Hector
David Miller
Assistant United States Attorneys
   -Of Counsel-

## **TABLE OF CONTENTS**

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . 2

      A.   Lopez Sr.'s Pre-Trial Motion for Severance . . . . . 2

      B.   The Government's Case at Trial . . . . . . . . . . . 2

            1.   The Government's Evidence . . . . . . . . . . . 3

            2.   The Javier Sanchez Murder . . . . . . . . . . . 4

            3.   The Jury Notes Concerning the Murder . . . . . . 6

            4.   Additional Evidence Against Lopez Sr. . . . . . . 8

      C.   The Defense's Case . . . . . . . . . . . . . . . . . 10

      D.   The Verdict . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 11

      LOPEZ SR.'S MOTION FOR A NEW TRIAL SHOULD BE DENIED . . . 11

      I.   Rule 33 Legal Standard . . . . . . . . . . . . . . 11

      II   Lopez Sr. Did Not Suffer Any Spillover Prejudice
          By Being Tried With His Narcotics Co-Conspirators . 12

            A.   The Standard Governing Severance Motions . . . 12

            B.   There Was No Basis for a
                Severance on Prejudice Grounds . . . . . . . . 16

                1.   Mendez's Testimony Concerning the
                      Sanchez Murder Was Proper and Narrow . . . 16

                2.   There Was No Prejudicial Spillover
                      Because the Murder Was
                      Admissible Separately Against Lopez Sr. . . 18

                3.   The Court Properly Instructed the Jury
                      On the Charges, the Sanchez Murder, and
                      The Admission of Evidence in
                      Multi-Defendant Cases.. . . . . . . . . . . 22

                4.   The Evidence Against Lopez Sr.
                      Was Overwhelming. . . . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . 25

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO THE MOTION FOR A NEW TRIAL BY AMAURY LOPEZ, SR.

The Government respectfully submits this Memorandum of Law in opposition to defendant Amaury Lopez Sr.'s Motion for a New Trial in the Interests of Justice Pursuant to Rule 33 ("Lopez. Sr. Br.").  By his motion, Lopez Sr. argues that he should be granted a new trial because his motions for severance –- made pre-trial and during trial -- were improperly denied. Specifically, Lopez Sr. alleges that severance was required because of the purported spillover prejudice resulting from the admission of evidence concerning a murder allegedly committed by Lopez Sr.'s co-defendants Amaury Lopez Jr. ("Lopez Jr.") and Fabio Morel ("Morel").

Lopez Sr.'s motion ignores well-established law that evidence of crimes committed by co-conspirators in furtherance of a narcotics conspiracy in which the defendant participated is admissible against that defendant.  Lopez Sr.'s claim of spillover prejudice is therefore fatally undermined because the same evidence of violence by his co-conspirators -- the murder of Javier Sanchez on or about August 1, 2004 -- was admissible against Lopez Sr. trial even if he had been tried alone. Moreover, Lopez Sr. ignores the Court's jury instructions, which amply cured any potential prejudice.  Finally, Lopez Sr.'s characterizations concerning the evidence submitted at trial, and the strength of the evidence against him, are flat wrong. Accordingly, Lopez Sr.'s motion should be denied.

## STATEMENT OF FACTS

**A.    Lopez Sr.'s Pre-Trial Motion for Severance**

On September 3, 2011, Lopez Sr. filed a motion to sever based on the same grounds articulated in his present motion.  On September 4, 2011, the Government filed its opposition memorandum.

On September 6, 2011, a conference was held before the Court during which the Court heard argument on Lopez Sr.'s motion.  Mr. Steven Brill, Esq., Lopez Sr.'s counsel, argued that because Lopez Sr. was purportedly not involved in the Sanchez murder, any evidence presented by the Government would unduly prejudice Lopez Sr. in a joint case, and that a curative instruction to the jury would not remedy the purported prejudice.  (See Sept. 6, 2011 Transcript ("Tr.") at 17-20, 41-43).  In opposition, the Government argued that because Lopez Sr. is a co-conspirator, and the murder was committed in furtherance of the conspiracy, the evidence was admissible against Lopez Sr. even in a separate trial.  (Tr. at 40).  Accordingly, there can be no prejudicial spillover -- the doctrine does not apply.  (Tr. at 40-41).  At the end of the conference, the Court denied Lopez Sr.'s motion.  (Tr. at 50).

**B.    The Government's Case at Trial**

The evidence at trial conclusively established that Lopez Sr. and his co-conspirators, Lopez Jr. and Morel, participated in

a conspiracy to distribute and possess with intent to distribute five kilograms and more of cocaine (Count One), and that each of the defendants also committed a substantive narcotics offense. As to Lopez Sr., the evidence demonstrated that Lopez Sr. attempted to distribute and possess with intent to distribute five kilograms and more of cocaine (Count Four).

**1.   <u>The Government's Evidence</u>**

At trial, the Government called 13 witnesses, including two cooperating witnesses, and introduced dozens of exhibits proving the defendants' guilt, including documents and drugs seized over the course of the conspiracy.  Law enforcement and cooperating witnesses conclusively established the existence and operation of the Lopez Organization's cocaine business from in or about 2002 through in or about September 2010; how the Organization shipped and distributed cocaine and drug money; and how the business spanned from Puerto Rico to New York City.  To this end, the Government introduced evidence from cooperating witnesses Lennyn Mendez ("Mendez") and Anita Nemickas ("Nemickas") concerning the means and methods by which the Lopez Organization, and the defendants in particular, carried out their drug business. Furthermore, the Government introduced numerous recorded conversations of the defendants discussing their narcotics activities, which indeed proved the defendants' guilt through their own words.

As part of its case, the Government also introduced testimony and exhibits concerning various drug and money seizures belonging to the Lopez Organization: (i) a December 30, 2002 seizure of approximately $130,000 at JFK Airport; (ii) a May 2005 seizure of approximately $365,000 in Puerto Rico; (iii) a July 26, 2006 seizure of approximately 7.8 kilograms of cocaine (as well as approximately 344 grams of heroin and 115 grams of crack) at an apartment on Gun Hill Road in the Bronx, New York; (iv) a February 18, 2009 seizure of approximately 6 kilograms of cocaine at JFK Airport; (v) a March 27, 2009 seizure of approximately 1 kilogram of cocaine at a Yonkers post office; (vi) an April 29, 2010 seizure of approximately 4 kilograms cocaine at the Van Cortland Motel in the Bronx, New York; and (vii) a September 9, 2010 seizure of approximately 1.5 kilograms of cocaine in the Bronx, New York.

## 2.   **The Javier Sanchez Murder**

While the aforementioned areas constituted the majority of the evidence submitted by the Government at trial, the Government also introduced limited evidence concerning how the Lopez Organization protected its drug business from theft.  The murder of Javier Sanchez was among such evidence.

The Government called Mendez to the stand on September 14, 2011.  The Government's direct examination was conducted in the morning and early afternoon on that date.  (See Trial Transcript

-4-

("Tr.") at 284-424).  On direct examination, Mendez testified about his involvement in the Lopez Organization and described the illegal actions of all three defendants.

Mendez also testified about the Javier Sanchez murder.  (See Tr. at 295-96, 364-82).  But the testimony the Government elicited on the murder was relatively brief -- particularly as compared to defense counsel's cross-examination on the subject. And the testimony was introduced for the limited purposes described in the Government's pre-trial Motion in Limine. Specifically, the evidence was admissible because it constituted direct substantive proof of the conspiracy charged in the Superseding Indictment; demonstrated the nature, existence, and background of the narcotics conspiracy; was evidence of a course of dealing between the defendants and their co-conspirators, as well as others, including the leadership structure of the organization and the methods employed to exert control over members of the organization; and demonstrated the relationship of trust that existed between the defendants and their co-conspirators in the conspiracy.  (See Government Memorandum of Law in Support of its Motion in Limine at 3.).  The Government also introduced evidence of the murder on direct examination, because as demonstrated at the September 6, 2011 pre-trial conference, the defense indicated it would cross-examine Mendez about the Sanchez murder to attack Mendez's credibility.  Thus,

-5-

the Government asked questions of Mendez to avoid the appearance to the jury that the Government was attempting to hide this <u>Giglio</u> material.  (<u>See</u> Sept. 6, 2011 Tr. at 28-30).

After the Government's relatively succinct questioning of Mendez concerning the Sanchez murder, the defense cross-examined Mendez from September 14, 2011 through September 15, 2011, most of which focused on the murder.  (<u>See</u> Tr. at 425-69; 481-642). Indeed, Lopez Sr.'s lawyer himself asked Mendez questions implicating the murder.  (<u>See</u> Tr. at 639).  The Government offered *no* additional evidence about the Sanchez murder other than offering Sanchez's death certificate into evidence at the conclusion of the Government's case.  (<u>See</u> Tr. at 949-50; Government Exhibit ("GX") 306).

### 3.   The Jury Notes Concerning the Murder

On September 15, 2011, during the defense's cross-examination of Mendez, the jury sent a note to the Court:

> Judge Crotty, could you please clarify or restate the charges against the defendants.  There is a great deal of peripheral information that is being presented.  It would be helpful to the jury to refocus on what we'll have to deliberate.  Many thanks.

(Tr. at 526).  In response to the note, defense counsel were in disagreement as to whether the Court should instruct the jury on the charges or send back the indictment.  To this end, Lopez Sr.'s attorney stated:

-6-

> MR. BRILL:  My feeling, Judge, is that they'll in
> due time be told officially what the defendants
> have been charged with.  Indeed, they've already
> been told.  I'm sure the government will reiterate
> it and I'm sure your Honor in the Court's charges
> will reiterate it.  My position is that I see no
> benefit to Mr. Lopez Sr. that the Court reread the
> charges simply because a juror has some confusion
> at this point that will probably be alleviated,
> will be alleviated at the end of the trial.

(Tr. at 527-28).  Notwithstanding Mr. Brill's belief that the

Court should say nothing, the Court decided that it would provide

a brief re-reading of the preliminary instructions to the jury

concerning the charges in the case, and would do so at the end of

that day.  (Tr. at 528-29).

During the afternoon session, however, Mr. Brill made a

motion for a mistrial because of the purported "spillover

prejudice" from the murder testimony.  (Tr. at 587-88).  The

Government responded by noting that the "spillover prejudice"

doctrine could not apply and that the defense, not the

Government, examined Mendez for hours on the Sanchez murder.

(Tr. at 588-89).  The Court agreed with the Government:

> I agree with Mr. Miller that all the evidence,
> excuse me, the bulk of time that Mr. Brill has
> suggested shouldn't be laid at the government's
> doorstep.  Mr. Mendez when he testified made a very
> succinct and concise statement about the murder in
> which he participated, and the cross-examination
> has focused on that almost exclusively.  So if
> there is prejudice here, it's not the government
> that's responsible.  At any rate, the motion for
> severance, renewed motion for severance and
> mistrial are denied.

(Tr. at 589-90).

At the end of the defense's cross-examination, the jury sent two additional notes to the Court.  Both of the notes related to the murder testimony.  One juror asked if the trial was a "murder trial," and another stated: "I'm confused as to why we're spending so much time with questions to Mr. Mendez concerning the murder when the defendants are Mr. Lopez Sr., Lopez Jr., and Mr. Morel."  (Tr. at 643).  At this juncture, Mr. Brill renewed his motion, although it was unclear whether it was his motion in opposition to admission of the Sanchez murder or for severance. (Id.).  In the midst of the parties' discussion about the jurors' notes, the Court rightly observed that the existence of separate juror notes "suggests to [the Court] they are not talking to one another.  They are following my instructions."  (Tr. at 644).

Later that day, the Court reminded the jury of the charges in the case by re-reading the relevant parts of its preliminary instruction.  (Tr. at 685-87).

### 4.   Additional Evidence Against Lopez Sr.

The Government's evidence against Lopez Sr. included the overall evidence of the narcotics conspiracy -- of which Lopez Sr. was a part -- and the actions of his co-conspirators in furtherance of the conspiracy, which can be considered against him.  In addition to that evidence, however, there was ample independent evidence about Lopez Sr.'s specific role and actions in the conspiracy.

-8-

First, the Government introduced several consensually-made recordings by the Government's confidential informant (the "CI") in February 2009, on March 31, 2009, and in May 2009 -- and transcripts of those recordings -- which showed Lopez Sr.'s membership in the narcotics conspiracy from his own words. (<u>See</u> GX-401-T, 402-T, 403-T, 404-T, 405-T, 406-T, 407-T, 900-T, 901-T, 902-T).

Second, the February 2009 recordings demonstrated that Lopez Sr. was involved in directing the CI to get someone to pick up at JFK Airport two suitcases containing six kilograms of cocaine belonging to the Lopez Organization. And of course, DEA Special Agent Lauren Paese testified about the February 18, 2009 seizure of those six kilograms of cocaine at JFK Airport. (Tr. at 704-13).

Third, on March 30, 2009, Westchester County Police Detective Kenneth Mignone testified that he saw Lopez Sr. drive Jesus Soto towards the Yonkers post office where Soto subsequently tried to pick up a package from Puerto Rico containing one kilogram of cocaine belonging to the Lopez Organization. (Tr. at 721-23). The package from Puerto Rico had been addressed to Soto. (Tr. at 909-10). Soto was arrested when he tried to pick up the package. (Tr. at 911-12). After Soto's arrest, Lopez Sr. participated in the March 31, 2009 recorded

conversation in which he, Lopez. Jr., and Morel discussed Soto's arrest.  (GX-900-T).

Fourth, Mendez testified, among other things, about his interaction with Lopez Sr.  Specifically, Mendez testified that he worked with Lopez Sr. during the narcotics conspiracy and had picked up a total of approximately 20-30 kilograms of cocaine from Lopez Sr. on two to three occasions at Lopez Sr.'s house at 357 North Broadway, Yonkers, New York.  (Tr. at 313-14).

*          *          *

On September 19, 2011, the Government rested its case. After the Government rested, Mr. Brill renewed his motion for severance, which the Court again denied.  (Tr. at 956-58).

**C.   <u>The Defense's Case</u>**

After the Government rested, on September 19, 2011, Mr. Ivan Fischer, Esq., on Lopez Jr.'s behalf, called one witness: DEA Special Agent O'Bun Duffy.  (Tr. at 960-82).  The defense then rested.  (Tr. at 988).

**D.   <u>The Verdict</u>**

On September 20, 2011, the Government presented its closing statement to the jury.  (Tr. at 1044-82).  Mr. Brill, on Lopez Sr.'s behalf, then gave his closing statement (Tr. at 1084-1103), followed by Mr. John Burke, Esq., on Morel's behalf (Tr. at 1103-34), and Mr. Fischer, on Lopez Jr.'s behalf (Tr. at 1134-59). The Government then began its rebuttal on September 20, 2011 (Tr.

at 1159-78), and completed it on September 21, 2011 (Tr. at 1198-
1220).  The Court then charged the jury (Tr. at 1222-1276), and
the jury began its deliberations in the late morning of September
21, 2011 (Tr. at 1278).

On September 21, 2011, after approximately three hours of
deliberations, the jury reached its verdict.  The jury found all
defendants guilty on all charges.  (Tr. at 1286-88).

<u>**ARGUMENT**</u>

<u>**LOPEZ SR.'S MOTION FOR A NEW TRIAL SHOULD BE DENIED**</u>

Lopez Sr.'s Rule 33 motion should be denied for the same
reasons the Court denied his pre-trial severance motion and
renewals of that motion during trial.  First, Lopez Sr.'s claim
ignores the fundamental fact that the evidence of the murder
committed by his co-conspirators in furtherance of the
conspiracy's cocaine business is independently admissible against
Lopez Sr.  Second, the Court instructed the jury regarding the
charges in the case, the consideration of evidence in a multi-
defendant case, and the limited nature for which the evidence was
introduced.  Third, contrary to Lopez Sr.'s contention, the
evidence at trial against him was overwhelming.

## I.   <u>Rule 33 Legal Standard</u>

Rule 33(a) permits the district court to "vacate any
judgment and grant a new trial if the interest of justice so
requires."  Fed. R. Crim. P. 33.  Rule 33, however, imposes an

extremely heavy burden on the defendant, and the Second Circuit has made it clear that motions for new trials "are disfavored in this Circuit . . . ."  United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995).  For relief to be granted under Rule 33, "there must be a real concern that an innocent person may have been convicted."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (quotation omitted); see United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005) ("'The ultimate test' is 'whether letting a guilty verdict stand would be a manifest injustice.'") (quoting Ferguson, 246 F.3d at 133).

## II.  Lopez Sr. Did Not Suffer Any Spillover Prejudice By Being Tried With His Narcotics Co-Conspirators

### A.  The Standard Governing Severance Motions

Rule 8 of the Federal Rules of Criminal Procedure provides, in pertinent part:

> **(a) Joinder of Offenses**.  Two or more offenses may be charged in the same indictment . . . if the offenses charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> **(b) Joinder of Defendants**.  Two or more defendants may be charged in the same indictment . . . if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.  Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

-12-

Rule 14 of the Federal Rules of Criminal Procedure permits severance of properly joined charges or defendants, at the discretion of the trial court, to avoid prejudice to a defendant or the Government.  See Fed. R. Crim. P. 14.[1]

Under Rule 8, "[t]here is a preference . . . for joint trials of defendants who are indicted together."  United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam) (quoting Zafiro v. United States, 506 U.S. 534, 537 (1993)); United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997).

This preference is particularly strong where the defendants are alleged to have participated in a common plan or scheme such as a narcotics conspiracy.  See Salameh, 152 F.3d at 115; United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991);  United States v. Turoff, 853 F.2d 1037, 1042 (2d Cir. 1988).  As the Supreme Court has explained:

> Many joint trials — for example, those involving large conspiracies to import and distribute illegal drugs — involve a dozen or more codefendants. . . .  It would impair both the efficiency and the fairness of the

---

[1]  Federal Rule of Criminal Procedure 14(a) provides, in pertinent part:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim P. 14(a).

> criminal justice system to require . . . that
> prosecutors bring separate proceedings,
> presenting the same evidence again and again,
> requiring victims and witnesses to repeat the
> inconvenience (and sometimes trauma) of
> testifying, and randomly favoring the last-
> tried defendants who have the advantage of
> knowing the prosecution's case beforehand.
> Joint trials generally serve the interests of
> justice by avoiding inconsistent verdicts and
> enabling more accurate assessment of relative
> culpability — advantages which sometimes
> operate to the defendant's benefit.  Even
> apart from these tactical considerations,
> joint trials generally serve the interests of
> justice by avoiding the scandal and inequity
> of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987); see also United States v. Zafiro, 945 F.2d 881, 886 (7th Cir. 1991) (Posner, J.) (joint trials reduce not only litigation costs but also "error costs," i.e., costs associated from depriving jury of making its determinations based on "the full picture"), aff'd, 506 U.S. 534 (1993).

Quite simply, the strong presumption is that defendants who are indicted together will be tried together.  See, e.g., Zafiro, 506 U.S. at 537; United States v. Blount, 291 F.3d 201, 209 (2d Cir. 2002); United States v. Reyes, 176 F.3d 52, 102 (2d Cir. 1999).  Given this presumption, the "prejudice" standard is difficult to satisfy and "defendants are not entitled to severance [under Rule 14] merely because they may have a better chance of acquittal in separate trials."  Zafiro, 506 U.S. at 540.  Even assuming that a particular defendant is somehow

-14-

prejudiced by joinder, the issue under Rule 14 is whether that prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986) (citing United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984)).  Thus, under the Supreme Court's decision in Zafiro, a discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. at 539.

Because of the preference for joint trials of defendants indicted together, and the near-total discretion afforded the trial judge in addressing any potential prejudice, a defendant seeking review of denial of severance under Rule 14 bears an "extremely difficult burden," United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989), of showing that he was so prejudiced by the joinder that he suffered a "miscarriage of justice" or was denied a constitutionally fair trial.  See United States v. Yousef, 327 F.3d 56, 150 (2d Cir. 2003); United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993).  Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." Rosa, 11 F.3d at 341.

### B.    There Was No Basis for a Severance on Prejudice Grounds

Assessed against this exacting standard, Lopez Sr.'s severance and mistrial motions on the ground of spillover prejudice were properly rejected by the Court pre-trial and during trial.  Lopez Sr. was not entitled to a separate trial given his membership in the conspiracy, even if he did not participate in the Sanchez murder directly.  Moreover, through its instructions, the Court ensured that the jury was not confused about the admission of the Sanchez murder and the submission of evidence in a multi-defendant trial.  Finally, the evidence of Lopez Sr.'s membership in the conspiracy was overwhelming and the jury properly convicted him.

1.    Mendez's Testimony Concerning the
Sanchez Murder Was Proper and Narrow

The Government introduced testimonial evidence showing that Lopez Jr., Morel, Mendez, and another conspirator ("CC-1") were involved in the Sanchez murder.   The Government submitted this evidence as proof, inter alia, of the existence of a narcotics conspiracy between the defendants and the means that were used to protect the conspiracy.  The murder was executed because Sanchez stole drug proceeds from Mendez and threatened to steal from Lopez Jr.  Thus, the murder was executed to further the Organization's drug distribution aims and to send a message to others that violence could be used to protect the organization's proceeds.  Consequently, notwithstanding Lopez Sr.'s repeated

-16-

claims that the Government "never produced any testimony or evidence linking Mr. Lopez, Sr. to the murder" (Lopez Sr. Br. at 2), the evidence is entirely related to the cocaine conspiracy in which the jury found Lopez Sr. a participant.[2]

Furthermore, contrary to Lopez Sr.'s claims, Mendez's testimony regarding the Sanchez murder was not "overly excessive." (Lopez Sr. Br. at 4). To the contrary, the Government narrowed Mendez's testimony about the murder to its critical facts, and the only other murder evidence the Government proffered during the trial was Sanchez's death certificate to prove that Sanchez is, in fact, deceased. Defense counsel, however, engaged in prolonged cross examination of Mendez concerning the homicide.[3] The Court, in fact, noted the length of Mendez's cross examination, as compared with the Government's direct examination:

---

[2]    Indeed, as described above and in the Government's pre-trial Motion in Limine, the evidence was admissible because it constituted direct substantive proof of the conspiracy charged in the Superseding Indictment; demonstrated the nature, existence, and background of the narcotics conspiracy; was evidence of a course of dealing between the defendants and their co-conspirators, as well as others, including the leadership structure of the organization and the methods employed to exert control over members of the organization; and demonstrated the relationship of trust that existed between the defendants and their co-conspirators in the conspiracy. See Government Memorandum of Law in Support of its Motion in Limine at 3. Furthermore, as discussed above, the Government examined Mendez on the Sanchez murder because the defense indicated its intention to cross-examine Mendez on the murder in order to attack Mendez's credibility.

[3]    Notably, Mr. Brill himself asked Mendez questions implicating the murder.  (See Tr. at 639).

> It's pretty clear from this why Mendez's
> testimony took so long, because it was the
> defense who went after Mr. Mendez suggesting
> that he was a complete liar and unworthy of
> belief.  So that's why Mendez's testimony took
> so long.  It wasn't the government that did it.
> It was the defense that did it.

(Tr. at 958).  Furthermore, the Court noted that the time spent

examining Mendez about the Sanchez murder "shouldn't be laid at

the government's doorstep.  Mr. Mendez when he testified made a

very succinct and concise statement about the murder in which he

participated, and the cross-examination has focused on that

almost exclusively.  So if there is prejudice here, it's not the

government that's responsible."  (Tr. at 589-90).

In sum, the Government's examination was far from

"excessive," and it was the defense that prolonged Mendez's

testimony on numerous issues, including the Sanchez murder.

> ### 2.   There Was No Prejudicial Spillover
> Because the Murder Was
> Admissible Separately Against Lopez Sr.

Lopez Sr.'s claim of prejudicial spillover is entirely

illusory because the evidence of the criminal activities of the

other members of this cocaine conspiracy would have been

admissible against Lopez Sr. in a separate trial as proof of the

existence of the charged conspiracy and as proof of the nature,

purposes and activities of that conspiracy.

It is axiomatic that "[w]here a defendant is a member of a

conspiracy, all the evidence admitted to prove that conspiracy,

even evidence relating to acts committed by co-defendants, is
admissible against the defendant." Salameh, 152 F.3d at 111;
see also United States v. Brady, 26 F.3d 282, 287 (2d Cir. 1994)
("evidence of specific acts that do not pertain directly to proof
of crimes committed by other individuals in a RICO conspiracy is
relevant to show the existence and nature of the enterprise.");
United States v. Gotti, 2004 WL 602689, at *5-8 (S.D.N.Y. Mar.
26, 2004) (denying motion for severance by RICO defendant not
charged with murder claiming prejudicial spillover from the
admission of other defendants' violence and murders).  Indeed,
"'the cases are legion that there is a strong public interest in
joint trials where, as here, the defendants are both charged in
the conspiracy.'" United States v. Guerrero, 669 F. Supp. 2d 417,
425 (S.D.N.Y. 2009) (citation omitted).  To this end, "[i]n
conspiracy cases, especially, any claim of 'prejudicial
spillover' does not justify severance because the evidence would
be admissible at a separate trial of the moving defendant." Id.

    Notably, the Second Circuit has likewise found unavailing
the argument that a joint trial results in substantial prejudice
because a jury may hear testimony of violent behavior unrelated
to a particular defendant.  See United States v. Spilleni, 352
F.3d 48, 55 (2d Cir. 2003) (rejecting defendant's argument that
substantial prejudice resulted from failure to sever him from his
co-defendant brother despite testimony "from prosecution

-19-

witnesses [who] related in graphic detail [his brother's] violent and murderous criminal history, a history [the defendant] did not share").

The Sanchez murder was undertaken by Lopez Sr.'s co-conspirators in furtherance of the cocaine conspiracy in which Lopez Sr. participated actively.  Because Lopez Sr. is criminally responsible for all acts in furtherance of the Lopez Organization conspiracy, this evidence would have been used in a separate trial against him.  Accordingly, separate trials would have resulted in an enormous duplication of efforts because the Government would have been required to call and subject to cross-examination many of the same law enforcement and cooperating witnesses that it called at the trial of Lopez Jr. and Morel. Under these circumstances, severance would have been extremely burdensome and could have needlessly disadvantaged the public, the Court, and the Government with lengthy, repetitive trials.

Moreover, even if the evidence of the murder was not admissible against Lopez Sr. –- and it clearly was -- the mere introduction against some defendants of evidence of violence or other crimes not committed by other defendants is not sufficiently prejudicial to warrant severance.  See United States v. Hernandez, 85 F.3d 1023, 1029-30 (2d Cir. 1996); Rosa, 11 F.3d at 341-42; United States v. Lasanta, 978 F.2d 1300, 1306 (2d Cir. 1992).  To this end, it is well settled that "[d]iffering levels

of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988) (quoting United States v. Carson, 702 F.2d 351, 366 (2d Cir. 1983)); see also United States v. Zackson, 6 F.3d 911, 922 (2d Cir. 1993) (same); United States v. Garcia, 848 F.2d 1324, 1334 (2d Cir. 1988) (rejecting non-RICO defendant's request for severance from RICO defendants charged with multiple racketeering and narcotics trafficking counts).  Indeed, the Second Circuit "has repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." United States v. Locasio, 6 F.3d 924, 947 (2d Cir. 1993); see also Carson, 702 F.2d at 366-367 (fact that defendant played less prominent role in conspiracy than many of his co-conspirators was insufficient ground for separate trial); United States v. Aloi, 511 F.2d 585, 598 (2d Cir. 1975) (individual trials are not warranted merely because of "differences in degree of guilt and possibly degree of notoriety of defendants").

    For all these reasons, Lopez Sr.'s prejudice claim rings hollow and is contrary to settled law in this Circuit.

3.    The Court Properly Instructed the Jury on the
Charges, the Sanchez Murder, and the
Admission of Evidence in Multi-Defendant Cases

Furthermore, Lopez Sr.'s allegation that the jury was

"confused" and unable to segregate the evidence between Lopez Jr.

and Morel on one hand, and Lopez Sr. on the other is speculative

and flat wrong.  The Court reminded the jury of the charges at

the beginning of the trial, during the trial after the jury

requested clarification on whether the murder had been charged as

a separate offense, and in its charge at the conclusion of the

case.  Thus, the jury clearly understood that there was not an

independent murder charge in this case.[4]

Moreover, in its final charge, the Court instructed the jury

to consider the evidence against each defendant separately:

Although there are facts common to the defendants
in the different counts, each defendant and each
count must be considered separately. . . . The case
against each defendant stands or falls upon the
proof or lack of proof against that defendant.
Your verdict as to any defendant on any count
cannot control your decision as to any other
defendant or on any other count.

(Tr. at 1245).  The Court also instructed the jury on why the

murder was admitted into evidence: "Testimony about the murder is

_____

[4]   To this end, Lopez Sr.'s contention that the jury's notes
provide "irrefutable proof" (Lopez Sr. Br. at 5) that the jury was
confused and unable to weigh the evidence against each defendant
separately is baseless.  The Court reminded the jury -- at the end
of the day that Mendez's testimony concluded -- of what the charges
were and thus the jury knew that there was no murder charge in the
case.  Notably, Mr. Brill attempted to preclude any such reminder
and even stated that any juror confusion on the charges "will be
alleviated at the end of trial."  (Tr. at 528).

in evidence because the government offered it as an act in
furtherance of the conspiracy.  It is up to you whether you
believe that."  (Tr. at 1237-38).

Accordingly, if any spillover prejudice from the Sanchez
murder did occur -- and it did not -- it was corrected by the
Court's instructions concerning the nature of the evidence and
that the jury consider the guilt of each defendant individually,
instructions that jurors are presumed to be able to follow.  See
United States v. Potamitis, 739 F.2d 784, 790 (2d Cir. 1984); see
also Lasanta, 978 F.2d at 1307 ("[t]he district court countered
any possible spillover with specific instructions to the jury
. . . that the jury should consider the evidence separately
against each defendant"); Zackson, 6 F.3d at 922; Guerrero, 669
F. Supp. 2d at 425.  Consequently, Lopez Sr. has provided no
legitimate claim -- nor can he -- that this jury was unable to
understand the nature of the charges and segregate the proof
against each defendant.

       4.  The Evidence Against Lopez Sr. Was Overwhelming

Finally, as discussed above, the Government put on
substantial evidence at trial of Lopez Sr.'s membership in this
narcotics conspiracy, including:  Lopez Sr.'s own words
discussing his narcotics activity; recordings demonstrating Lopez
Sr.'s February 2009 attempt to arrange the pick up of cocaine at
JFK Airport; Lopez Sr.'s transport of Jesus Soto to the Yonkers

post office to pick up a package containing cocaine; and Mendez's testimony about the large amount of cocaine he picked up from Lopez Sr.  Lopez Sr., however, claims that "the evidence against Mr. Lopez, Sr. was not so overwhelming as to render the Mendez testimony harmless error." (Lopez Sr. Br. at 8).  Lopez Sr. also claims that the "government produced very little evidence with regard to Mr. Lopez, Sr.'s guilt" and that Lopez Sr. was "not a member of any alleged conspiracy." (Lopez Sr. Br. at 6,8).  But, as demonstrated above, this is patently untrue, and the jury found that Lopez Sr.'s claim was belied by the mountain of evidence.  Thus, contrary to Lopez Sr.'s claims, his conviction was based on the recordings/transcripts and the testimonial evidence against him, not based on some purported "unfair prejudice created by the Mendez testimony." (Lopez Sr. Br. at 9).

Accordingly, because Lopez Sr. was convicted by a jury based on overwhelming evidence after a fair trial, where there was not and could not be "spillover prejudice," Lopez Sr.'s Rule 33 motion should be rejected.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny Lopez Sr.'s motion for a new trial.

Dated:    New York, New York
          November 21, 2011


                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney
                         Southern District of New York


                    By: s/David Miller
                         Aimee Hector/David Miller
                         Assistant United States Attorneys
                         Telephone: (212) 637-2203/2484

<u>CERTIFICATE OF SERVICE</u>

DAVID MILLER deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on November 21, 2011, he caused to be served a copy of the foregoing Government's Opposition to the Motion for a New Trial by Amaury Lopez, Sr., by filing a copy via ECF:

Ivan S. Fisher, Esq
125 E. 50th Street
New York, NY 10022
Phone: (212) 517-5000
Fax: (212) 486-7701

John Burke, Esq.
26 Court St., Suite 2805
Brooklyn, NY 11242
Phone: 718-875-3707

Steven Gary Brill, Esq.
Sullivan & Brill LLP
115 Broadway, 17th Flr.
New York, NY 10006
Phone: (212) 566-1000
Fax: (212) 566-1068

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. Section 1746.

s/David Miller
David Miller

Executed on: November 21, 2011
             New York, New York