**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :

**UNITED STATES OF AMERICA**        :

                                                                  :        **S2 10 Cr. 798 (PAC)**

    v.                                      :

**AMAURY LOPEZ JR.,**               :
    a/k/a "Junior,"

        **Defendant.**           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

 

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Aimee Hector/David Miller
Assistant United States Attorneys
   – Of Counsel –



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 12, 2012

**BY ECF AND HAND DELIVERY**

The Honorable Paul A. Crotty
United States District Court Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

  Re: <u>United States</u> v. <u>Amaury Lopez Jr.</u>, S2 10 Cr. 798 (PAC)

Dear Judge Crotty:

  The Government respectfully submits this letter in connection with the July 10, 2012 sentencing of defendant Amaury Lopez Jr., a/k/a "Junior," (the "defendant" or "Lopez Jr."), and in response to the defendant's July 6, 2012 sentencing submission ("Def Ltr."). As set forth herein, the Government believes that a Guideline's sentence of life imprisonment, as set forth in the Pre-Sentence Report ("PSR"), is reasonable and appropriate given the nature and seriousness of the offense.

## FACTUAL BACKGROUND

**A.** **<u>The Lopez Organization</u>**

  From at least 2002 through September 2010, Amaury Lopez Jr. ("Lopez Jr.") was the leader of a large-scale cocaine trafficking organization (the "Lopez Organization" or "Organization") that shipped hundreds of kilograms of cocaine from Puerto Rico to New York for distribution.[1] The Lopez Organization employed numerous individuals who assisted the

---

[1] The information provided in the factual background discussed herein is derived from testimony and evidence admitted at trial. This information is also provided in the PSR from paragraphs 1 through 38.

illegal drug-trafficking operation, many of whom are Lopez Jr.'s family members and co-defendants. Lopez Jr. and his co-conspirators utilized both human couriers and the mails to accomplish their unlawful objectives.

Fabio Morel ("Morel") was Lopez Jr.'s right-hand man, and worked for Lopez Jr. in packaging narcotics and receiving drug proceeds in Puerto Rico and retrieving and distributing narcotics that had been shipped to the New York City area. Amaury Lopez Sr. ("Lopez Sr.") worked with Lopez Jr. in coordinating drug shipments from Puerto Rico and providing the drugs to Lopez Jr.'s distributors. Maribel Lopez was involved in the Lopez Organization's shipment of money from the New York City area to Puerto Rico to pay for narcotics that would be shipped back. Morel, Lopez Sr., and Maribel Lopez thus performed key functions for the Lopez Organization in the packaging, receipt and distribution of cocaine in the United States, and the handling of narcotics proceeds, much of which was transported back to Puerto Rico. William Pozo ("Pozo") assisted Morel in distributing some of the Organization's narcotics.

Maribel Lopez and Pozo pled guilty prior to trial. The Government filed a Prior Felony Information against Lopez Jr., Lopez Sr., and Morel prior to trial. Trial commenced against Lopez Jr., Lopez Sr., and Morel before this Court on September 12, 2011 on Indictment S2 10 Cr. 798 (PAC), and concluded on September 21, 2011. The Superseding Indictment charged that from in or about 2002 through in or about September 2010, the defendants conspired to distribute and possess with intent to distribute five kilograms and more of cocaine (Count One); Lopez Jr. and Morel were each charged with a substantive offense of distribution and possession with intent to distribute 500 grams and more of cocaine (Counts Two and Three); and Lopez Sr. was charged with attempting to distribute and possess with intent to distribute five kilograms and more of cocaine (Count Four). On September 21, 2011, the jury found all three defendants guilty on all charges.

**B.**     **The Trial and the Evidence**

The Government called 13 witnesses at trial, and introduced numerous exhibits proving the defendants' guilt, including documents and drugs seized over the course of the conspiracy. Law enforcement witnesses and cooperating witnesses conclusively established the existence and operation of the Lopez Organization's cocaine business from in or about 2002 through in or about September 2010; how the Organization shipped and distributed cocaine and drug money; and how the business spanned from Puerto Rico to New York City. The evidence showed that over the conspiracy period, the Lopez Organization sold and distributed at least 1,000 kilograms of cocaine. Furthermore, the Government introduced numerous recorded conversations of the defendants discussing their narcotics activities, which proved the defendants' guilt through their own words.

At trial, the Government proved the facts set forth below concerning the operation of the Lopez Organization, its conduct and means, and the actions of the trial defendants, Lopez Jr., Lopez Sr., and Morel.

*How the Organization Operated*

The Lopez Organization operated by purchasing cocaine in Puerto Rico, which was then prepared for shipment to the United States via mailing services and in suitcases aboard airplanes. The cocaine was often secreted inside aluminum cans disguised as food products, among other methods of transport. Once the cocaine arrived in the United States, it was distributed to mid-level traffickers in the New York area. Sale of the Lopez Organization's cocaine resulted in profits of millions of dollars, which were collected by members of the Organization and then prepared for shipment back to Puerto Rico. Often, the U.S. currency was hidden inside vacuum-sealed bags or cans and transported to Puerto Rico via human couriers or through the mail.[2]

Lopez Jr. used other conspirators to secure cans, sealing machines, and stamping machines to transport cocaine and currency in his narcotics business. Some of the cans were from the Freund Container Supply Company (referenced below). At one point, Lopez Jr. also had another conspirator investigate and order candles, in which Lopez Jr. intended to ship cocaine.

*The Organization's Use of Violence and Weapons*

Members of the Lopez Organization used weapons and violence to maintain control of the Organization's workers, drug trafficking territory, and proceeds. Many members of the Organization carried firearms, including .40 caliber and 9 millimeter firearms and an Uzi, and possessed other paraphernalia, such as bullet proof vests. The evidence further demonstrated that the success and longevity of the Lopez Organization was owed primarily to Lopez Jr.'s reputation for violence. Lopez Jr. exerted control over his underlings through violence, fear, and intimidation, and exacted retribution on individuals who threatened the Organization either by theft or by cooperating with law enforcement.

Indeed, members of the Lopez Organization utilized those firearms when necessary to protect the Organization's profits. To this end, and as established at trial, in August 2004, Lopez Jr., Fabio Morel, a shooter named Carlito, and a cooperating witness killed an individual named

---

[2] Notably, as introduced at trial, in a March 31, 2009 recorded conversation, Lopez Jr., Lopez Sr., and Morel discussed how they purchased cocaine in Puerto Rico and shipped it to New York for sale. (*See* Government Exhibit ("GX-") 700-T). As the Government showed at trial, this recording was essentially a primer on how the Lopez Organization operated its narcotics business.

Javier Sanchez because the Organization believed that Sanchez had stolen the cooperating witness's drug proceeds and threatened to steal proceeds belonging to Lopez Jr. The cooperating witness had 9mm and Desert Eagle Smith & Wesson .40 caliber handguns and provided the .40 caliber to Lopez Jr. for the Sanchez murder.

The Government also introduced at trial evidence of another example of Lopez Jr.'s use of violence to protect his drug business. At one point, a cooperating witness (and fellow drug dealer) told Lopez Jr. that there was an unsuccessful robbery of his apartment where drug proceeds were stored. The dealer told Lopez Jr. that he saw a suspicious Nissan Murano vehicle parked nearby when this occurred. After being informed of the unsuccessful robbery, Lopez Jr. later believed a Nissan Murano had followed him and so Lopez Jr. fired a gun at the Nissan.

Furthermore, the evidence at trial showed that Lopez Jr. stored guns in his home in Englewood Cliffs, New Jersey, and in his Hummer, which had a secret compartment inside. Lopez Jr. shipped handguns from Puerto Rico by breaking them apart. Moreover, Lopez Jr. had an Uzi stored at his child's mother's home for protection. Similarly, as noted in a May 19, 2009 recorded conversation, Lopez Sr. admitted that he had maintained a gun and drugs in a safety deposit box. (*See* GX-901-T).

Notably, as the evidence at trial showed, Lopez Jr. would threaten any individual who spoke with law enforcement about the Organization's activities. By way of example, when Lopez Jr. found out that Pozo had been arrested and had spoken with law enforcement, he was furious and stated, in sum and substance, that Pozo's leg should be chopped off.

*Seizures of the Organization's Drugs, Guns, and Money*

Throughout the course of the conspiracy, law enforcement seized drugs, guns and money belonging to the Lopez Organization. Evidence was presented at trial establishing the facts set forth below.

December 30, 2002 Cash Seizure at JFK Airport

On December 30, 2002, approximately $130,000 U.S.C. contained in a vacuum-sealed bag was seized from carry-on luggage at JFK Airport. A courier told law enforcement that the money was from sale of a restaurant by courier's parents – a restaurant licensed to Theresa Flynn, one of Lopez Jr.'s girlfriends.

May 2005 Cash Seizure in Puerto Rico Post Office/UPS Store

In May 2005, approximately $365,000 U.S.C. contained in aluminum cans were seized at a Post Office/UPS store in Puerto Rico. The following pertinent facts concerning this seizure, among others, were established at trial:

- Morel attempted to pick up the money using a fake identification.
- UPS logs showed that Morel had been picking up packages at the store for over a year.
- Express mail receipts for those packages indicated the packages had been sent from the same non-existent Yonkers address (13 Knowles Street) that Lopez Jr. used when he bought his Hummer.
- In an interview with law enforcement, Morel admitted that he had been going to the UPS store since 2003.
- Morel admitted to lying about his identity.
- Prior to the seizure, a cooperating witness brought approximately $150,000 in narcotics proceeds to the Lopez residence at 357 North Broadway in Yonkers, New York. Lopez Jr. and Morel were already at the apartment. A short time later, Maribel Lopez arrived with an additional $180,000 in cash. The money was counted using a money counter. This money was packaged, sent to Puerto Rico, and seized.

### July 26, 2006 Seizure of Drugs, Guns, and Cash in the Bronx

On July 26, 2006, approximately 7.8 kilograms of cocaine, 344 grams of heroin, 115 grams of crack, a scale/kilo press, two handguns, and U.S.C. were seized from a stash house on Gun Hill Road in the Bronx, New York. The drugs had been packaged in the hallmark of Lopez Organization (vacuum sealed in plastic bags with numbers on each half kilo). Furthermore, the apartment had been used by an individual (Jairo Tavarez) who was a Lopez Organization customer. Notably, the name "Amaury" was found in a drug ledger in the apartment.

### February 18, 2009 Drug Seizure at JFK Airport

On February 18, 2009, approximately six kilograms of cocaine in aluminum cans were seized from two suitcases at JFK Airport. During the February 2009 recorded conversations introduce at trial, Lopez Sr. discussed finding someone to pick up the suitcases at JFK Airport.

March 27, 2009 Drug Seizure at Yonkers Post Office

On March 27, 2009, approximately one kilogram of cocaine in an aluminum can was seized at a Post Office in Yonkers, New York. The following pertinent facts concerning this seizure, among others, were established at trial:

- In or about March 2009, law enforcement officers conducted surveillance at the Yonkers Post Office after learning that an aluminum can containing approximately one kilogram of cocaine was shipped to the Post Office for pick up by a Lopez Organization co-conspirator, Jesus Soto. (Law enforcement seized the package.).
- In the course of the surveillance, law enforcement officers observed Lopez Sr. arrive with Jesus Soto, and then circle the Post Office in an effort to conduct counter-surveillance. Shortly thereafter, Lopez Jr. and Maribel Lopez arrived in another vehicle and also conducted counter-surveillance of the Post Office. After Lopez Sr. dropped Soto off at the Post Office, Soto was arrested as he attempted to claim the package, and Lopez Sr., Lopez Jr. and Maribel Lopez sped off from the location.
- In a March 31, 2009 recorded conversation, Lopez Jr., Lopez Sr., and Morel spoke about getting Soto a lawyer.

April 29, 2009 Drug Seizure at Bronx Hotel

On April 29, 2009, approximately four kilograms of cocaine were seized in the vicinity of
the Van Cortlandt Hotel in the Bronx, New York. The following pertinent facts concerning this seizure, among others, were established at trial:

- Lopez's cocaine was delivered to the hotel. Morel was there. Pozo arrived later. Law enforcement officers had the hotel under surveillance.
- The drugs were delivered inside cigar boxes with cigars clued on top, and those cigar boxes were contained in suitcases.
- The drugs were removed from the containers and Pozo left with them in a backpack. Morel then tried to dispose of evidence of the four kilograms by throwing out the remaining trash.
- Pozo was arrested near the hotel after he left with the drugs.
- Morel was then arrested.

September 9, 2010 Drug Seizure in the Bronx

On September 9, 2010, approximately 1.5 kilograms of cocaine were seized in the Bronx, New York. In early September 2009, a cooperating witness and Lopez Jr. negotiated a 1.5

kilogram cocaine transaction. (Recordings of these conversations were made.). On September 9, 2010, the cooperating witness got 1.5 kilograms from a Lopez Jr. worker, provided it to law enforcement, and thus was not able to pay Lopez Jr. for the product. Lopez Jr. was angered by the lack of payment, and continued to harass the witness for the money. Lopez Jr. made clear that he is "the one who gives orders here." (GX-707-T).

*Lopez Jr. Is Arrested*

On October 6, 2010, Lopez Jr. was arrested. In his vehicle was a catalogue from the Freund Container Supply Company addressed to "Maribel Lopez" at the 357 North Broadway address referenced at trial. As described above, trial evidence demonstrated that hundreds of aluminum cans were purchased by the Lopez Organization from the Freund Container Supply Company to secret both cocaine and money for shipment to and from Puerto Rico. Furthermore, at his arrest, Lopez Jr. had in his possession an April 29, 2009 surveillance video of the Van Cortlandt Hotel – the same night that approximately four kilograms of cocaine were seized and where Morel and Pozo were arrested.

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## DISCUSSION

As discussed below, the Government respectfully submits that after applying the sentencing factors to Lopez Jr.'s conduct, a Guidelines sentence is clearly warranted.

### A.  Application of the Sentencing Guidelines

The applicable sentencing guideline to the offenses charged in Count One and Count Two (against Lopez Jr. only) is U.S.S.G. § 2D1.1. (PSR ¶ 43). Pursuant to Section 3D1.2(d), Counts One and Two are grouped together because the offense level is determined largely on the basis of the quantity of the substance involved. (PSR ¶ 42). Under Section 2D1.1, the defendant's base offense level is 38 (§ 2D1.1(c)(1)), and, because a dangerous weapon was possessed during the offense and violence was employed, four levels are added (§ 2D1.1(b)(1) & (2)), resulting in a total offense level of 42. (PSR ¶¶ 44-45). Pursuant to § 2D1.1(b)(12), two levels are added because the defendant maintained a premises for the purpose of manufacturing

or distributing a controlled substance. (PSR ¶ 46). Finally, four additional levels are added because Lopez Jr. was the leader of the criminal activity, which involved five or more participants and/or was extensive, resulting in a total offense level of 48. (PSR ¶¶ 49, 55). As noted in the PSR, Lopez Jr. has ten criminal history points and is in Criminal History Category V (PSR ¶¶ 56-77), which results in a Guidelines range of life imprisonment, with a mandatory minimum term of 20 years' imprisonment (pursuant to the filing of the Prior Felony Information). (PSR ¶¶ 129-130).

Although no longer binding upon the Court, the Guidelines sentence of life imprisonment appropriately reflects the seriousness of Lopez Jr.'s offense and is reasonable and appropriate in light of the nature and scope of Lopez Jr.'s criminal conduct.

**B.** **The Section 3553(a) Factors**

A Guidelines sentence of life imprisonment for Lopez Jr. is appropriate pursuant to the factors set forth in 18 U.S.C. § 3553(a).

First, the nature and circumstances of the offense clearly warrants a life sentence. Lopez Jr. was the leader of a cocaine trafficking organization that was vast in both the duration of the conspiracy and the quantity of drugs distributed. Lopez Jr. employed numerous people over nearly a decade of drug-dealing, including several family members, who performed various tasks such as packaging hundreds of kilograms of cocaine, transporting it from Puerto Rico to the United States, and delivering the product to customers. Throughout this time period, Lopez Jr. lined his pockets with the substantial proceeds of his criminal activity. In fact, Lopez Jr.'s extensive narcotics business earned him the status of a Drug Enforcement Administration Regional Priority Organization Target ("RPOT").

The Lopez Jr. Organization was able to operate for so long without law enforcement intervention because of one thing – Lopez Jr. maintained control over his drug trafficking organization with an iron fist, using violence and threats of violence to protect his business. In a recorded conversation with Lennyn Mendez, Lopez Jr. described himself as follows:

> This guy [referring to himself] is the boss. I'm the one who gives orders here. I'm…you have to obey the people that are above you.

GX-707-T p.4. The victims of Lopez Jr.'s crime include not only the drug users and their families, but also drug rivals who threatened Lopez Jr.'s lucrative business. As evidenced at trial, Lopez Jr. often displayed firearms and orchestrated the brutal murder of Javier Sanchez, who had stolen drug proceeds from Lopez Jr.'s associate and threatened to steal from Lopez Jr. as well. Lopez Jr. planned the murder and helped carry it out, making sure that other members of his organization performed the most risky tasks so that Lopez Jr. could avoid any responsibility.

Notably, just as in the Javier Sanchez murder, Lopez Jr. consistently made sure to insulate himself from the risks of law enforcement action, so that he could continue to reap the benefits of his drug business, even while his underlings served prison sentences. In recorded conversations introduced at trial, Lopez Jr. described how he devised numerous "tricks" to evade imprisonment, including employing drug couriers who had minimal criminal records so that if they were arrested, they would serve only short jail terms. He also described that if one of his workers were arrested, he would personally pay for his/her attorney, so that he/she would not cooperate with law enforcement against Lopez Jr. For example, Lopez Jr. stated:

> I've got another trick. We need someone, a young kid…. A young kid that doesn't have a … so if something happens, we can get him a lawyer…. and he can get a reasonable plea deal. We can't be involving our own families and let them get screwed. Remember that when people get arrested, I deal with them....I can't put a relative in where something's going to happen to your own family.

(GX-902-T p. 3). In fact, one of the recorded conversations at trial occurred during a car ride to drop off money to an attorney for Jesus Soto, who had been arrested retrieving a package of cocaine for Lopez Jr.. These strategies allowed Lopez Jr. to enjoy the fruits of his illegal enterprise, while hiding behind lower-level employees who served prison sentences for his Organization. Now, convicted of a wide-ranging narcotics conspiracy, the time has finally come for Lopez Jr. to be punished for his own crimes.

Second, the history and characteristics of the defendant and the need to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), further support a Guidelines sentence. Lopez Jr.'s first narcotics-related conviction occurred when he was 20 years old. Despite serving terms of imprisonment for several drug-related offenses, Lopez Jr. has always continued to return to narcotics trafficking upon release. Clearly, these prior sentences failed to deter Lopez Jr. from re-engaging in criminal conduct. Further, as the PSR indicates, Lopez Jr.'s violent tendencies are well documented. In addition to the violent conduct proven at trial, he was arrested and convicted of Assault in the First Degree in 1985 after stabbing and nearly killing another individual. (PSR ¶ 56). In 2008, he was convicted of Improper Behavior after a physical altercation with his wife, Theresa Flynn. (PSR ¶ 73). He also has several arrests for violent conduct, including charges of Murder, Attempted Murder, and Assault. (PSR ¶¶ 78-91). In sum, there is absolutely no reason to believe that Lopez Jr. will not continue to engage in violence and narcotics trafficking if he should ever be released from prison.

### C. Defendant's Sentencing Submission and Objections to PSR

Lopez Jr. raises several objections to the PSR, most of which can be fairly summarized in three categories: (1) Lopez Jr. objects to the weapon and violence enhancements pursuant to §

2D1.1(b)(1) & (2), and (2) the leadership enhancement pursuant to § 3B1.1(a), on the grounds that they are only supported by the testimony of Lennyn Mendez who, in Lopez Jr.'s estimation, was not credible; and (3) Lopez Jr. objects to the allocation of one additional criminal history point for engaging in the charged conduct while under a criminal justice sentence, pursuant to § 4A1.1(d). None of these arguments have merit.

First, the enhancements for weapons and the use, threatened use, or direction that others use violence are entirely appropriate. As the Court is aware, the Court must find that the enhancements are supported by a preponderance of evidence. Lennyn Mendez testified credibly that Lopez Jr. possessed and used firearms on numerous occasions and controlled his subordinates through threats of violence. Mendez further testified that Lopez Jr. planned the murder of a drug rival, Javier Sanchez, which was executed at Lopez Jr.'s behest. Mendez's testimony alone would provide sufficient support for the enhancements. However, application of these enhancements is not based on Mendez's testimony alone. Two handguns, bullets, and a magazine clip were seized from the Gun Hill Road stash house and admitted at trial. Further evidence linked Lopez Jr. to the Gun Hill Road property, including a drug ledger bearing his name and cocaine bearing the Organization's signature markings. In addition, recordings were admitted into evidence, several of which contained discussions among the conspirators concerning the use of guns and violence. (*See* GX-901-T (Lopez Sr. discussing the fact that he had maintained a gun and drugs in a safety deposit box); *United States v. Soto*, 959 F.2d 1181, 1186 (2d Cir. 1992) (weapons enhancement applies if weapon was connected with the offense, even if defendant did not have "personal possession, or even actual knowledge of the weapon's presence" as long as "possession of the firearm was reasonably foreseeable to the defendant."). In fact, the sheer volume of money and narcotics transported and distributed by the Organization alone would be enough to suggest that the presence of firearms was reasonably foreseeable, as such instruments are widely recognized tools of the drug trade. *See United States v. Kimberlin*, 18 F.3d 1156, 1160 (4th Cir. 1994).

Second, the evidence at trial overwhelmingly established Lopez Jr.'s leadership of the Organization. In fact, there is no better evidence of Lopez Jr.'s position at the helm of this Organization than his own words:

> This guy [referring to himself] is the boss. I'm the one who gives orders here. I'm…you have to obey the people that are above you.

GX-707-T p.4. Lopez Jr. explicitly refers to himself as the boss and the only person who has the authority to control the sale terms for the Organization's cocaine. Later in this same conversation, Lopez Jr. literally screams at Mendez for selling Lopez Jr.'s cocaine on credit, a practice which Lopez Jr. expressly forbids and describes as "...the only law I put on you..." (*Id.* at p.7; *see also id.* at 5 (Lopez Jr. stating "I didn't *authorize* you to let go of that" (emphasis added)); *id.* at 9 ("Look, when someone gives you orders, you can't do anything. You just can't do it.")). In additional recorded conversations, Lopez Jr. proudly describes the narcotics

trafficking strategy that he "invented." (GX-900-T at 8 ("And I invented this route, and I felt great about it.")). He also asserts that he assumes responsibility for hiring lawyers for his underlings when they are arrested. (*See* GX-902-T p. 3). Lopez Jr. further explains that the reason he hires attorneys for his workers is so that they will not cooperate with law enforcement against him, the leader of the Organization.

Lopez Jr.'s leadership position was also described by two cooperating witnesses, Mendez and Anita Nemickas. Nemickas described how Lopez Jr. approached her nearly a decade ago to facilitate the purchase of aluminum cans and sealing equipment to transport cocaine from Puerto Rico to the United States. Mendez described how Lopez Jr. ran his organization, hiring workers to package cocaine, couriers to transport it, and lower-level distributors to deliver it to his customers. The testimony of Nemickas and Mendez was corroborated by the aforementioned recorded conversations and the numerous seizures of cocaine and currency linked to the Lopez Jr. Organization. On the basis of this testimony and the other evidence adduced at trial, there can be no question that Lopez Jr. was the leader of this narcotics conspiracy and that he maintained his power and control through violence, intimidation, and by insulating himself from law enforcement detection at the expense of his subordinates.

Finally, Lopez Jr. contests the application of one criminal history point for committing part of the instant offense while under a criminal justice sentence, pursuant to § 4A1.1(d). In May 2007, during the time period charged in the instant case, Lopez Jr. was sentenced to a conditional discharge for driving while impaired by alcohol. As set forth in Application note 4 of § 4A1.1, a two point enhancement is warranted if the "defendant committed any part of the instant offense (i.e., any relevant conduct) while under any criminal justice sentence. . . ." U.S.S.G. § 4A1.1 cmt.. n.4. The note defines "criminal justice sentence" as any sentence with a "custodial or supervisory component, although active supervision is not required for this subsection to apply." *Id.* It is well established that because the court retains the supervisory power to revoke a conditional discharge under N.Y. Penal Law § 65.05, that this "supervisory component is sufficient to bring defendant's conditional discharge sentence within the meaning of a 'criminal justice sentence' under § 4A1.1(d)." *United States* v. *Labella-Szuba*, 92 F. 3d 136, 138 (2d Cir. 1996) (holding that conditional discharge qualifies as criminal justice sentence under provision of Sentencing Guidelines therefore justifying increasing criminal history score); *see also United States* v. *Bouknight*, 639 F.3d 26 (2d Cir. 2010) (holding defendant should receive two criminal history points for possessing firearm after having been convicted of felony while on conditional discharge on narcotics charge); *United States* v. *Ramirez*, 421 F.3d 159, 164 (2d Cir. 2005) (finding supervisory component is met so far as sentencing court can revoke or modify sentence if defendant violates condition).

**D.** **Forfeiture**

The Government respectfully requests that this Court enter a $26,000,000.00 money judgment against Lopez Jr. (jointly and severally liable with co-defendant Fabio Morel, against

whom a forfeiture order has been entered by the Court), and enter a preliminary order of forfeiture against certain real property located in Englewood Cliffs, New Jersey.

*Applicable Forfeiture Law*

Under Rule 32.2 of the Federal Rules of Criminal Procedure, once a criminal defendant is convicted of the offense giving rise to the forfeiture allegations in an Indictment, the district court must determine what property is subject to forfeiture and, if appropriate, enter a preliminary order of forfeiture. Although a court may enter a preliminary order of forfeiture prior to sentencing, the court must orally order the forfeiture at the time of sentencing. *See* Fed. R. Crim. P. 32.2(b).

The forfeiture statute pertaining to a narcotics offense is mandatory and broadly requires that the defendant "shall forfeit" to the United States "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of" the violation. 21 U.S.C. § 853(a)(1). Furthermore, the forfeiture statute pertaining to a narcotics offense requires that the defendant "shall forfeit" to the United States "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of" the violation. 21 U.S.C. § 853(a)(2).

In addition to seeking forfeiture of specific property that constitutes or is derived from proceeds traceable to a crime, the Government may obtain a money judgment against the defendant to recover the amount of the crime proceeds. *See, e.g.*, *United States* v. *Kalish*, 626 F.3d 165, 169 (2d Cir. 2010); *United States* v. *Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (forfeiture order may include money judgment for amount of money involved in an offense; money judgment acts as lien against defendant personally for duration of his prison term and beyond); Fed. R. Crim. P. 32.2.

Criminal forfeiture is "an aspect of sentencing." *Libretti* v. *United States*, 516 U.S. 29, 49 (1995). Because fact-finding at sentencing is established by a preponderance of the evidence, the preponderance of the evidence standard applies to criminal forfeiture. *See United States* v. *Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999). Accordingly, the Government must prove by a preponderance of the evidence the amount of proceeds underlying the proposed personal money judgment listed in the order of forfeiture, and prove by a preponderance of the evidence that the subject property in which the defendant has an interest that the Government is seeking to forfeit was used to facilitate the defendant's criminal activity.

In cases involving continuing schemes and conspiracies, the amount involved in the entire scheme is forfeitable. *See, e.g.*, *United States* v. *Royer*, 549 F.3d 886, 904 (2d Cir. 2008) (holding that defendant in insider trading case was properly ordered to forfeit all profits earned by defendant's tippees); *United States* v. *Hasson*, 333 F.3d 1264, 1279 n.19 (11th Cir. 2003) (in money laundering case, if defendant is convicted of conspiracy, forfeiture may be based on

amounts defendant conspired to launder, including amounts derived from uncharged substantive conduct, or substantive counts for which he has been acquitted).  Furthermore, "co-conspirators are liable jointly and severally to forfeit the reasonably foreseeable proceeds of their criminal activity." *United States* v. *Coleman Commercial Carrier, Inc.*, 232 F. Supp. 2d 201, 204 (S.D.N.Y. 2002); *see United States* v. *Roberts*, 660 F.3d 149, 165-66 (2d Cir. 2011) (stating that in narcotics conspiracy, mandatory liability for value of proceeds is joint and several among all conspirators, and permitting "reasonable estimate" based on "available information" to determine foreseeable value of narcotics for money judgment).

A money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment. *See, e.g.*, *United States* v. *Awad*, 598 F.3d 76, 78 (2d Cir. 2010) (holding that 21 U.S.C. § 853 permits imposition of money judgment on defendant who possesses no assets at the time of sentencing); *United States* v. *Kalish*, 626 F.3d at 169; *United States* v. *Day*, 524 F.3d 1361, 1377-78 (D.C. Cir. 2008) (amount of money judgment is not limited to "those assets in the defendant's possession at the time forfeiture is ordered") (citing cases); *United States* v. *Vampire Nation*, 451 F.3d 189, 201-02 (3d Cir. 2006) (forfeiture judgment may be entered for full amount of criminal proceeds, even if defendant is unable to satisfy judgment at time of sentencing; otherwise, defendants would be able to "dissipate those proceeds and avoid liability for the ill-gotten gains").

*A $26,000,000.00 Money Judgment Should Be Entered Against Lopez Jr.*

In this case, there was credible testimony that the narcotics conspiracy lasted for nearly a decade and involved at least 1,000 kilograms of cocaine.  Further, if called to testify, an agent of the Drug Enforcement Administration would testify that the average price of a kilogram of cocaine over the course of the conspiracy was $26,000.  *See Awad*, No. 06 Cr. 600 (DLC), 2007 WL 3120907, at *4 (S.D.N.Y. Oct. 24, 2007) (accepting Government's estimate of gross proceeds attributable to street value of narcotics), *aff'd* 598 F.3d 76.  Accordingly, the Government seeks a money judgment in the amount of $26,000,000.  Because this judgment was also entered against co-defendant Fabio Morel, Lopez Jr.'s should be jointly and severally liable for this amount with co-defendant Morel.

*A Preliminary Order of Forfeiture Should Be Entered
Against Lopez Jr.'s Interest in the New Jersey Property*

In forfeiting facilitating property involved in drug activity, "the Government must have probable cause to connect the property with narcotics activity ... but need not link the property to a particular transaction." *U.S.* v. *Banco Cafetero Panama*, 797 F.2d 1154, 1160 (2d Cir 1986); *see United States* v. *Gaskin*, 364 F.3d 438, 459, 462-63 (2d Cir. 2004) (vehicle drug dealer used to drive to location where he was to take delivery of drugs, and cash that he intended to use to

pay for drugs and other expenses related to their distribution, forfeitable as facilitating property under 21 U.S.C. §§ 881(a) and 853(a)(2)). In this case, there was ample trial testimony that Lopez Jr.'s property at 435 Summit Street, Englewood Cliffs, New Jersey (the "Englewood Cliffs Property") was used to facilitate the commission of his narcotics offenses.

As discussed above, the trial evidence showed that Lopez Jr. kept and used guns in furtherance of his drug activity. Those guns included handguns and an Uzi. Mendez credibly testified that he saw Lopez Jr. with those guns at his homes and in his car. (Tr. at 358). Mendez also testified that he had two homes where he kept his weapons: in Puerto Rico, and in Englewood Cliffs, New Jersey. (Tr. at 359). Furthermore, as the trial evidence showed, Lopez Jr. had these weapons as protection and to further his narcotics activity. (*See, e.g.,* Tr. at 360). Thus, the Englewood Cliffs Property was used by Lopez Jr. to store his weapons that furthered his narcotics activity. Accordingly, the Englewood Cliffs Property was property that "facilitated the commission" of his drug-trafficking crimes and is thus subject to forfeiture. 21 U.S.C. § 853(a)(2); *see Gaskin*, 364 F.3d at 459, 462-63; *Banco Cafetero Panama*, 797 F.2d at 1160. The Government will be submitting at sentencing a proposed preliminary order of forfeiture seeking the forfeiture of the aforementioned $26,000,000.00 money judgment and the Englewood Cliffs Property.

## **CONCLUSION**

       For the reasons set forth above, the Government respectfully submits that Lopez Jr.'s crimes are appropriately penalized in the Guidelines. Accordingly, the Government requests that the Court impose a life sentence, as it is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

                                   Respectfully Submitted,

                                   PREET BHARARA
                                   United States Attorney

By:          /s/
              Aimee Hector/David Miller
              Assistant United States Attorneys
              Tel.: (212) 637-2484/-2203

cc:     Mr. Henry Marines, Esq. (by facsimile)